**EXHIBIT A**

# TABLE OF CONTENTS
## PART I

Page

SPECIAL RISKS TO BE CONSIDERED BY PURCHASERS ............................................. 1

INTRODUCTION ................................................................................................................ 18
    The Condominium ...................................................................................................... 20
    Features of Condominium Ownership ....................................................................... 21
    Offering of Units for Sale .......................................................................................... 26

CERTAIN DEFINITIONS .................................................................................................. 28

BATTERY PARK CITY AUTHORITY AND THE PROJECT AREA ............................. 40

SUMMARY OF THE LEASE ............................................................................................. 42
    Landlord ...................................................................................................................... 42
    Tenant ......................................................................................................................... 42
    Term ........................................................................................................................... 42
    Base Rent and Rent .................................................................................................... 42
    Percentage Rent and Non-Residential Revenue ........................................................ 46
    Payments in Lieu of Taxes ("PILOT") ..................................................................... 46
    Civic Facilities ........................................................................................................... 47
    Impositions ................................................................................................................. 49
    Use .............................................................................................................................. 49
    Insurance .................................................................................................................... 50
    Repairs and Maintenance ........................................................................................... 51
    Compliance with Laws, Requirements of Insurance Underwriters and
    Master Lease .............................................................................................................. 51
    Changes, Alterations and Additions ........................................................................... 52
    Damage or Destruction .............................................................................................. 52
    Obligations with Respect to Construction and Maintenance of Civic Facilities ....... 53
    Condominium Operation; Defaults ............................................................................ 54
    Sale and Mortgaging of Units .................................................................................... 58
    Condemnation ............................................................................................................ 59
    Reporting Requirements ............................................................................................. 61
    Miscellaneous ............................................................................................................ 61
    Amendment to Declaration and By-Laws .................................................................. 62
    General ........................................................................................................................ 62
    Security Fund .............................................................................................................. 62
    Submission of Property to Condominium Regime ..................................................... 64

DESCRIPTION OF PROPERTY AND IMPROVEMENTS .............................................. 66
    Construction of the Building ...................................................................................... 66
    Residential Units ........................................................................................................ 67

Resident Manager's Unit ............................................................................. 68
Terraces ........................................................................................................ 69
Commercial Units ......................................................................................... 69
General Common Elements ......................................................................... 70
Residential Common Elements .................................................................... 71
Residential Limited Common Elements ...................................................... 73
Commercial Common Elements ................................................................... 73
Commercial Limited Common Elements ..................................................... 74
Services and Facilities .................................................................................. 74
General .......................................................................................................... 77
Security Procedures ...................................................................................... 78

LOCATION AND AREA INFORMATION ............................................... 80
Location and Services .................................................................................. 80
Zoning and Use ............................................................................................ 81

SCHEDULE A - Prices and Related Information for the Projected
First Year of Condominium Operation ...................................................... 83

SCHEDULE B - Projected Budget for First Year of Condominium Operation ............... 101

SCHEDULE B-I - Energy Costs Projection ............................................... 113

COMPLIANCE WITH REAL PROPERTY LAW SECTION 339-i(1) ....................... 117

COMMERCIAL UNITS ............................................................................ 121

CHANGES IN PRICES AND UNITS ....................................................... 124
Changes in the Residential Section ........................................................... 124

PROCEDURE TO PURCHASE ................................................................ 127
Escrow and Trust Fund Requirements ...................................................... 131

EFFECTIVE DATE .................................................................................... 136

TERMS OF SALE ...................................................................................... 138

CLOSING COSTS AND ADJUSTMENTS ............................................... 144

RIGHTS AND OBLIGATIONS OF SPONSOR ................................................................ 149
    Sponsor's Obligations with Respect to the Building .......................................... 149
    Leasing and Use of Unsold Residential Units ................................................... 154

CONTROL BY SPONSOR ............................................................................................. 156

BOARDS OF MANAGERS ............................................................................................. 159

RIGHTS AND OBLIGATIONS OF UNIT OWNERS
AND THE BOARDS OF MANAGERS .......................................................................... 165
    Sales and Leases of Units .................................................................................. 165
    Use of Units ....................................................................................................... 166
    Use of Common Elements .................................................................................. 168
    Mortgage of Units by Unit Owners ................................................................... 170
    Common Charges: Determination and Assessment ........................................... 170
    Common Charges: Collection and Lien for Non-Payment ................................ 172
    RPL §339-jj-Borrowing By Board of Managers ............................................... 174
    RPL §339-kk-Payment of Rent Where Default in Payment
       of Common Charges ....................................................................................... 174
    Repairs to and Maintenance of Units
       and Common Elements ................................................................................... 175
    Alterations and Improvements of Units
       and Common Elements ................................................................................... 177
    Rights of Access ................................................................................................. 179
    Compliance with Terms of Declaration,
       By-Laws and Rules and Regulations ............................................................. 180
    Examination of Books and Records .................................................................... 180
    Repair or Reconstruction after Fire or Other Casualty ...................................... 180
    Insurance ............................................................................................................ 181
    Liability of Boards of Managers and Unit Owners ............................................ 182
    Reports to Unit Owners ...................................................................................... 183
    Termination of Condominium ............................................................................ 183
    Units Acquired by Residential Board or Commercial Board .............................. 183
    Procedure to Review PILOT Assessments ......................................................... 184
    Mechanics' Liens ............................................................................................... 184
    Easements ........................................................................................................... 184
    Name of Condominium ...................................................................................... 186
    The Declaration and By-Laws ............................................................................ 186
    Obligations Under Lease .................................................................................... 186
    Rules and Regulations to Which the Residential Unit Owners Shall be Subject ..... 186

PAYMENTS IN LIEU OF TAXES ("PILOT") ............................................................. 193

TAXES -- DEDUCTIONS TO RESIDENTIAL UNIT OWNERS
AND TAX STATUS OF CONDOMINIUM ................................................................... 194
    Deductibility of Mortgage Interest and PILOT ................................................. 194

Taxation of the Condominium ...................................................................... 194

OPINION OF COUNSEL RE: DEDUCTIONS TO RESIDENTIAL UNIT
OWNERS AND TAX STATUS OF CONDOMINIUM ......................................... 197

OPINION OF COUNSEL RE: SECTION 339-i(1) ............................................ 207

OPINION OF COUNSEL RE: REAL ESTATE TAXES ...................................... 211

WORKING CAPITAL FUND AND APPORTIONMENTS ..................................... 220

MANAGEMENT AGREEMENT ..................................................................... 222

IDENTITY OF PARTIES .............................................................................. 225
    Sponsor and Selling Agent .................................................................... 225
    Managing Agent .................................................................................... 225
    Attorneys for Sponsor ........................................................................... 226
    Sponsor's Architects/Engineers ............................................................ 226
    Sponsor's Energy Expert ....................................................................... 226
    Sponsor's Condominium Expert ............................................................. 226

RECORDATION, INSPECTION AND DELIVERY OF DOCUMENTS .................. 227

GENERAL ................................................................................................. 228

STATEMENT OF BUILDING CONDITION ..................................................... 230

# TABLE OF CONTENTS
## PART II

| Caption | Exhibit | Page |
|---|---|---|
| PURCHASE AGREEMENT | 1 | 233 |
| RESIDENTIAL UNIT POWER OF ATTORNEY | 2 | 257 |
| UNIT DEED | 3 | 263 |
| DESCRIPTION OF PROPERTY | 4 | 271 |
| FLOOR PLANS | 5 | 303 |
| DECLARATION OF CONDOMINIUM | 6 | 393 |
| CONDOMINIUM BY-LAWS | 7 | 543 |
| UNIT MORTGAGE SUBORDINATION AND RECOGNITION AGREEMENT | 8 | 545 |
| COLLATERAL RESIGNATION | 9 | 557 |
| CERTIFICATIONS: | | |
| SPONSOR AND PRINCIPALS | 10 | 561 |
| SPONSOR'S ARCHITECT | 11 | 565 |
| SPONSOR'S EXPERT CONCERNING ADEQUACY OF CONDOMINIUM BUDGET | 12 | 571 |
| SPONSOR'S EXPERT CONCERNING ADEQUACY OF COMMON CHARGES PAYABLE BY THE COMMERCIAL UNIT OWNERS | 13 | 575 |
| ESCROW AGREEMENT | 14 | 579 |
| W-9 REQUEST FOR TAXPAYER IDENTIFICATION | 15 | 587 |
| W-8 CERTIFICATE OF FOREIGN STATUS | 16 | 593 |
| APPLICATION TO THE ATTORNEY GENERAL FOR A DETERMINATION OF THE DISPOSITION OF DOWNPAYMENTS | 17 | 597 |
| RPL §339-kk | 18 | 603 |
| SPECIMEN TITLE POLICY AND LETTER FROM TITLE COMPANY | 19 | 607 |

## PART I

**SPECIAL RISKS TO BE CONSIDERED BY PURCHASERS**

1.    On or about June 30, 2004, Sponsor was designated by the Battery Park City Authority ("BPCA") as the developer of a mixed-use leasehold condominium project located on the Property (as hereinafter defined) within the project area known as "Battery Park City." In furtherance thereof, Sponsor has entered into a ground lease for the Property with BPCA (the "Lease"). Sponsor will submit its leasehold interest in the Property to a leasehold condominium regime and will become the declarant under the Declaration (as hereinafter defined). Each purchaser of a Unit will acquire from Sponsor, as declarant under the Declaration, a leasehold condominium interest in such Unit and a proportionate undivided leasehold interest in the Common Elements of the Condominium. The Lease is subject to the Master Lease covering all of the property in the Battery Park City project area which area includes other condominium and rental residential projects as well as commercial buildings. The Condominium Act (as hereinafter defined) permits the creation of residential and multi-purpose leasehold condominiums at Battery Park City, which are designated as "qualified leasehold condominiums."

The Lease will expire on June 17, 2069. At the expiration of the Lease, the Condominium Board on behalf of the Unit Owners will be required, in order to retain the leasehold interests in the Property, to negotiate an extension or new lease with the holder of fee title to the Land and Building or the landlord under the Master Lease, as the case may be, at such time.

If the Condominium Board is unable to obtain, or if for any reason the fee owner or landlord under the Master Lease, as the case may be, refuses to grant an extension or new lease, or grants an extension on terms unacceptable to the Unit Owners, the leasehold estate will terminate and the Unit Owners will be required at such time (but no sooner than June 17, 2069) to surrender their ownership interests and possession of the Units and the Property. In such event, Unit Owners shall no longer have the right to possession of the Property or to remain in occupancy of their Units. A purchaser is advised that as the term of the Lease diminishes, the value of the leasehold condominium unit diminishes. Accordingly, as the term of the Lease diminishes, it will become increasingly difficult to arrange for, or to refinance, a mortgage on a Unit. Furthermore, unless an extension or new lease is negotiated the prices of Units being resold toward the expiration of the Lease will likely be adversely affected because of the decreasing length of the term of the Lease. No representation is made or warranty given as to whether the Lease will be extended or renewed or as to the terms of any such extension or the right of Unit Owners to remain in occupancy thereafter.

After the First Closing the Tenant under the Lease will be the Condominium Board which will be responsible for complying with the obligations under the Lease. In no event will a failure by any Unit Owner to pay Proportionate Rent (as hereinafter defined) constitute a default under the Lease, but a default by the Condominium Board to turn over to BPCA Residential Proportionate Rent collected from the Residential Unit Owners could result in the termination of the Lease (and hence the ownership rights of the Residential Unit Owners in their Residential Units).

The Lease establishes certain limitations on the right of the Boards and the Unit Owners to modify the exterior façade including but not limited to modifications to the height, set back or bulk of the Building. In the event of any inconsistency between the terms of the Lease and the terms of the Declaration and By-Laws, the terms of the Lease will govern. No statement herein shall be deemed to constitute the consent or approval to any matter which BPCA has the right to approve or consent to pursuant to the terms of the Lease, Declaration or By-Laws.

See the Sections of the Plan entitled "Battery Park City Authority and the Project Area" and "Summary of the Lease" for more details.

2. Pursuant to the terms of the Lease, the Residential Unit Owners will be obligated to pay, as a portion of Common Charges, their proportionate share of certain items of Rent under the Lease attributable to the Residential Section, including, without limitation, Base Rent, Payments in Lieu of Taxes ("PILOT"), Civic Facilities Payments, sewer rents, water charges, vault charges, public utility charges, license and permit fees and the cost of maintaining insurance coverage for the sidewalk and street trees (the "Residential Proportionate Rent") as more fully defined in the Section of the Plan entitled "Summary of the Lease" under the Subsection entitled "Rent and Base Rent." Under the terms of the Lease, the Residential Proportionate Rent collected from the Residential Unit Owners and a certain portion of the Rent attributable to the Commercial Units (the "Commercial Proportionate Rent") (the Residential Proportionate Rent and the Commercial Proportionate Rent are collectively referred to as the "Proportionate Rent") shall be held in trust by the Condominium Board for the benefit of BPCA and segregated from the balance of funds so collected at BPCA's request. The first funds received as Common Charges or otherwise from a Unit Owner shall be applied to the Proportionate Rent due from such Unit Owner.

The Condominium Board will determine the amount of General Common Expenses (which includes the amount of the Residential Proportionate Rent and Commercial Proportionate Rent due from each Residential Unit Owner and the Commercial Unit Owners, as established under the Lease as well as other operating expenses of the Condominium), to satisfy the obligations of the Condominium under the Lease. The Residential Board will determine the amount of Residential Common Expenses.

In the opinion of counsel to Sponsor subject to receipt of a favorable ruling from the Internal Revenue Service ("IRS"), as described below, Residential Unit Owners will be able to take a deduction on their individual income tax returns for their pro rata share of PILOT. A ruling on the deductibility of PILOT under Section 164 of the Internal Revenue Code of 1986, as amended, will be requested. The deductibility of PILOT is therefore subject to receipt of a favorable ruling from the IRS. Upon receipt of a ruling from the IRS Sponsor will amend the Plan to disclose same. In the event that Sponsor does not obtain a favorable ruling from the IRS, Residential Unit Owners may not be able to take a deduction on their individual income tax returns for their pro rata share of PILOT.

See the Sections of the Plan entitled "Introduction" under the Subsection entitled "Features of Condominium Ownership," "Summary of the Lease" and "Taxes—Deductions to Residential Unit Owners and Tax Status of Condominium" for more details.

3. At the time a Purchase Agreement is executed, a Purchaser is required to make a Down Payment in an amount equal to ten (10%) percent of the purchase price with an additional ten (10%) percent of the purchase price payable no later than the earlier to occur of (i) six (6) months after Sponsor delivers a counter-executed Purchase Agreement to Purchaser or (ii) fifteen (15) days after the mailing of an amendment to the Plan declaring the Plan effective. In the event a Purchaser defaults under the Purchase Agreement, time being of the essence with regard to the obligations of the Purchaser thereunder, and does not cure such default within thirty (30) days after Sponsor gives notice to the Purchaser of such default, Sponsor may, at its option, either (i) cancel such Purchase Agreement and retain, as liquidated damages, the Down Payment made by the Purchaser, together with interest earned thereon, if any, or (ii) bring an action against such Purchaser for specific performance, in which event Purchaser could be compelled to complete the transaction.

Additionally, if a Purchaser fails for any reason to close title to the Residential Unit on the originally scheduled Closing Date and Sponsor elects not to cancel the Purchaser's Purchase Agreement as a result of the same, (a) the closing apportionments to be made at the Closing will be made as of midnight of the day preceding the originally scheduled Closing Date, and (b) the Purchaser will be required to pay to Sponsor an amount equal to 0.03% of the purchase price of the Residential Unit for each day that the Closing is adjourned.

Purchasers are further advised that if a Purchaser makes a Down Payment in excess of $100,000 for the purchase of a unit, such Down Payment will not be federally insured in excess of $100,000; and (ii) while the Down Payment is in the non-interest bearing checking portion of the Master Escrow Account, the Down Payment may not be fully federally insured even if the Down Payment does not exceed $100,000. Funds drawn on out-of-state or foreign banks will not be accepted in payment of the purchase for a residential unit unless otherwise agreed in writing by Sponsor. The Purchase Agreement also provides that Purchaser shall be obligated to reimburse Sponsor for any reasonable legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under the Purchase Agreement or, in the event Purchaser defaults under the Purchase Agreement beyond any applicable grace period, in canceling the Purchase Agreement or otherwise enforcing Purchaser's obligations thereunder. Please refer to the Section entitled "Procedure to Purchase" and to the Purchase Agreement set forth in full in Part II of the Plan for further discussion of the foregoing. Purchasers will not be charged legal fees or disbursements in connection with the establishment, defense or maintenance of Sponsor's obligations arising out of the handling or disposition of trust funds.

4. Although a Purchaser may obtain financing from a lending institution or any other source, the obligation to purchase a Residential Unit pursuant to the Purchase Agreement shall not be contingent on obtaining financing for such purchase. No Unit Owner can obtain financing secured by a Unit unless the holder of the mortgage granted in connection with such financing enters into a recognition agreement as same is required by BPCA (the "Recognition Agreement"). THE

16-17(1-2 Special Risks)

FACT THAT THE RESIDENTIAL UNITS ARE LEASEHOLD CONDOMINIUM UNITS AND THAT THE LIEN OF THE HOLDER OF A MORTGAGE SECURED BY A RESIDENTIAL UNIT IS SUBORDINATE TO THE LIEN OF THE CONDOMINIUM BOARD FOR COMMON CHARGES TO THE EXTENT SUCH COMMON CHARGES ARE COMPRISED OF PROPORTIONATE RENT, MAY MAKE THE RESIDENTIAL UNITS MORE DIFFICULT TO FINANCE AND PURCHASERS MAY FIND THAT SUCH FINANCING IS AVAILABLE UPON TERMS AND CONDITIONS WHICH ARE NOT AS FAVORABLE AS MAY HAVE BEEN OTHERWISE AVAILABLE TO PURCHASERS OF CONDOMINIUMS ELSEWHERE IN THE CITY OF NEW YORK. PURCHASERS WHO ARE UNABLE TO OBTAIN FINANCING AS THE RESULT OF THE FOREGOING RISK LOSING THEIR DOWN PAYMENTS. NEITHER SPONSOR NOR ANY SELLING AGENT MAKES ANY REPRESENTATIONS AS TO THE TERMS OR AVAILABILITY OF ANY MORTGAGE FINANCING. Prospective Purchasers are, therefore, advised to finalize their financing arrangements before signing a Purchase Agreement. However, prospective Purchasers should be aware that even if a loan commitment is obtained, its term may be fixed, and it could expire before the Closing Date and a Purchaser would have to close without financing or risk losing such Purchaser's Down Payment. (See the Section entitled "Procedure to Purchase" for further details.)

5. Prior to the closing of title to a Residential Unit, the Purchase Agreement prohibits a Purchaser from advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or lease. Purchasers are referred to the Purchase Agreement set forth in Part II of the Plan.

6. (a) Sponsor as the owner of Unsold Residential Units will have voting control of the Residential Board during the period which continues until the later to occur of (i) any meeting of the Residential Unit Owners at which the votes cast for Sponsor's nominees do not constitute a majority of the votes cast at such meeting or (ii) five (5) years after the First Closing.

(b) During the period that Sponsor controls the Condominium Board or the Residential Board, Sponsor will have control of maintenance, facilities and services to be provided to Unit Owners and will determine the Residential Common Charges to be paid by all Residential Unit Owners.

(c) The Condominium Board will become the Tenant under the Lease as of the First Closing. The Condominium Board shall consist of three (3) members from the Residential Unit Condominium Board and two (2) members from the Commercial Unit Condominium Board. the Condominium Board will be controlled by the Residential Unit Owners. Any person elected or designated to serve on any Board, prior to assuming membership on such Board, shall execute a collateral resignation in favor of BPCA, which resignation may be exercised by BPCA, and a replacement member designated by BPCA, in the event that the Board upon which such member serves fails to cure any Condominium Default for which Board is responsible, in accordance with the terms of the Lease.

16-17(1-2 Special Risks)

7.     Sponsor will have voting control of the Condominium Board during the period Sponsor owns at least ten percent (10%) of the Common Interests attributable to unsold Residential Units, as more fully described above and in the Section of the plan entitled "Control By Sponsor." In addition, Sponsor and its designees may exercise veto power over some actions of the Condominium Board and the Residential Board. Until Sponsor and its designees have conveyed title to all Residential Units, but in no event later than five (5) years after the First Closing, the Condominium Board or the Residential Board may not take any of the following actions without Sponsor's prior written consent: (a) make any addition, alteration or improvement to the Common Elements or to any Unit, or (b) assess any General Common Charges or Residential Common Charges for the creation or addition to or replacement of all or part of a working capital, reserve, contingency or surplus fund, or (c) increase or decrease the number, or change the kind of employees referred to in the Plan, or (d) enter into any service or maintenance contract for work not covered by contracts in existence on the date of the First Closing or otherwise provide services in excess of those referred to in the Plan, except as is required to reflect normal annual increases in operating services, or (e) borrow money on behalf of the Condominium, or the Residential Section, or (f) exercise a right of first refusal to lease or purchase a Residential Unit; provided, however, that Sponsor's written consent is not necessary to perform any function or take any action described in clauses (a) through (f) above, if and only if, the performance of such function or the carrying out of such an action is necessary (and no other alternative is available) to enable the Condominium Board or the Residential Board to comply with laws, rules or regulations of any Governmental Authority having jurisdiction over the Condominium and to comply with the obligations under the Lease. (see the Section entitled "Control By Sponsor" for further details).

8.     The Commercial Units may be used for any lawful purposes, including, without limitation, use as a library, community center, eating and drinking establishments, department and other retail stores and outlets, health clubs, storage, theaters, banks, restaurants, commercial and professional offices and studios. No amendment, modification, addition or deletion of the Declaration, By-Laws or Rules and Regulations shall be effective in any way, (a) without the prior written consent of the Garage Unit Owner with respect to any amendment, modification, addition or deletion of or to the By-Laws, the Declaration or the Rules and Regulations modifying the permitted uses of the Garage Unit or affecting the rights, privileges, easements, licenses or exemptions granted to the Garage Unit Owner or (b) without the prior written consent of Sponsor or its designee or the owner of any Unsold Residential Unit, as the case may be, with respect to any amendment, modification, addition or deletion of or to the By-Laws, the Declaration or the Rules and Regulations modifying the permitted uses of the Building or any portion thereof or affecting the rights, privileges, easements, licenses or exemptions granted to Sponsor or its designee or the owner of any Unsold Residential Unit, as the case may be, or otherwise adversely affecting Sponsor or its designee or the owner of any Unsold Residential Unit, as the case may be. In addition, the consent of BPCA may be required for an amendment, modification, addition or deletion of the Declaration, By-Laws or Rules and Regulations. (See the Section entitled "Summary of the Lease" under the Subsection entitled "Amendment to Declaration and By-Laws" and the Section entitled "Rights and Obligations of Unit Owners and the Boards of Managers.")

6

9.  Construction is a complicated process requiring the coordination of numerous tasks, contractors and suppliers and the balancing of complex mechanical and architectural systems. No assurance can be given with regard to the accuracy of any projected completion dates set forth herein. During the first year of Condominium operations, construction workers and related personnel will be at the Property from time to time making adjustments and performing various tasks related to the completion of construction. Various systems, including but not limited to water supply, air conditioning, heating, cooling, ventilating and elevators, may require more than a year after any Unit Closing to complete and may need to be shut down temporarily. Various other adjustments, to windows and elevators and other systems, may require eighteen (18) months or more after the First Closing to complete. Sponsor may not fully complete the decoration of the Lobby or corridors in the Building, including but not limited to installing light fixtures, hanging wall coverings or laying carpeting, until that particular floor is fully occupied by Residential Unit Owners. In addition, certain services, such as cable, computer, and other similar services may be provided by outside suppliers and delays in these services will not be the responsibility of Sponsor unless such delays are caused by Sponsor. In addition, such suppliers may not provide these services until occupancy in the Building has reached certain levels.

In the event that the First Unit Closing is delayed twelve (12) months or more beyond July 1, 2007, then all Purchasers who have executed Purchase Agreements and whose Purchase Agreements are still in effect, will be given the right to rescind their Purchase Agreements.

Please refer to the Section of the Plan entitled "Description of Property" in Part I of the Plan for further details.

10.  The PILOT estimates for each Residential Unit were calculated on the assumption that the PILOT for the Residential Section payable with respect to each Residential Unit for the first year of Condominium operation will be allocated in proportion to each Residential Unit's Common Interest, as set forth on Schedule A. Upon determination of individual tax lots and individual Residential Unit assessments, the New York City tax authorities may allocate assessments between the Residential Units in proportion to each Residential Unit's purchase price rather than its Common Interest, and, if so, Residential Units having the same or similar Common Interest may pay different PILOT and PILOT payments may differ from those set forth on Schedule A. At such time as the Units are separately assessed, Sponsor will amend the Plan to disclose the PILOT payable based upon such assessments. Please refer to the Section of the Plan entitled "Payments in Lieu of Taxes (PILOT)" in Part I of the Plan for further details.

11.  The Residential Unit Owners have no control over the uses of the Commercial Units except as restricted by the Zoning Resolution of the City of New York and the Declaration and By-Laws. (See "Commercial Units" for further details). The use of the Commercial Units may generate noise, traffic, fumes or other disturbances over which the Residential Unit Owners will have no control. The Commercial Units share the cost for certain expenses based upon Common Interest and share other costs based upon anticipated usage. Please refer to the "Introduction" Section of the Plan under the subsection entitled, "Features of Condominium Ownership" and Schedule B for further details regarding the allocation of Common Expenses.

16-17(1-2 Special Risks)

12.     Sponsor reserves the right to sell two or more Residential Units as more fully described in the "Introduction" of the Plan and to designate the purchaser of such blocks of Units as "sponsor" under this Plan and the Declaration. The party so designated as a "sponsor" will have those additional rights and obligations of a "sponsor" as more fully described in the Plan and will not be subject to the Condominium's right of first refusal with respect to sales and leasing. Accordingly, such parties may have an advantage over individual Residential Unit Owners who desire to sell or lease their Units. Any party acquiring ten (10) or more Units in the Condominium will also be deemed a "sponsor" under with the terms of the regulations promulgated by the New York State Department of Law, with the obligation, among other things, to register with the Department of Law and amend the Plan as may be required. Pursuant to the Declaration and By-Laws, the Residential Units may be used for residential purposes only, or certain other lawful purposes subject to conditions set forth in the Declaration and By-Laws.

13.     The exterior surface of all windows (including, but not limited to, that portion of the Building constructed with a double curtain wall) in the Residential Section if so determined by the Residential Board shall be washed and cleaned by such Board and the cost and expense thereof shall be a Residential Common Expense and be specially assessed against each Residential Unit Owner. Otherwise, the exterior of all windows in the Residential Section shall be washed or cleaned at the cost and expense of the Residential Unit Owner. The interior glass surfaces of all windows located in any Unit and the exterior glass surfaces of all windows located in the Commercial Units shall be washed and cleaned at the sole discretion of the Unit Owner or occupant thereof at such Unit Owner's sole cost and expense. After the closing of title to a Residential Unit, a Residential Unit Owner will be solely responsible for maintaining casualty insurance with respect to everything within the Unit from the outside surface of the sheetrock walls of such Unit, including, without limitation, the wall coverings, flooring, appliances, fixtures, equipment, personal property, improvements and betterments situated within such Unit Owner's Residential Unit, as well as liability insurance with respect to occurrences in or about such Unit Owner's Residential Unit. The By-Laws require that each Unit Owner maintain such insurance coverage. In the event a Unit Owner fails to obtain the appropriate coverages, funds may not be available to restore the Unit to its previously condition. Please refer to the Section of the Plan entitled "Rights and Obligations of Unit Owners and the Boards of Mangers" under the subsections entitled "Repairs to and Maintenance of Units and Common Elements" and "Insurance" in Part I of the Plan for further details.

14.     Purchasers shall be obligated to pay the NYC Real Property Transfer Tax and NYS Real Property Transfer Tax (Deed Stamps) which by Law are the primary obligation of the Seller. For purposes of calculating the taxes payable, the amounts of such taxes will be included in the consideration subject to such tax. If the purchase price of the Residential Unit is $1,000,000 or more, Purchaser shall also be obligated to pay the New York State Additional Tax pursuant to Article 31 of the Tax Law, commonly referred to as the "Mansion Tax," currently one (1%) percent of the purchase price, which by Law is the primary obligation of the Purchaser. (See the Section entitled "Closing Costs and Adjustments" for further details).

15.     It is noted that although it is the intent of Sponsor that all Residential Units be offered for sale pursuant to the terms of the Offering Plan, Sponsor has reserved the unconditional right to

16-17(1-2 Special Risks)

8

withhold certain Residential Units from sale. In the event that the Sponsor withholds one (1) or more of the Residential Units from sale, Sponsor shall amend the Plan to disclose which Units are being withheld. If Sponsor leases certain Residential Units to tenants and such Units are subsequently offered, Sponsor shall amend the Plan, accordingly, if such Units are offered subject to such tenancies.

Although Sponsor shall make a good faith effort to sell the Residential Units to purchasers who will occupy their Units as their personal residences ("owner-occupants"), prospective purchasers should be aware that the decision to sell, not to sell or rent any Unit shall be made by the Sponsor based upon its evaluation of market conditions and its own financial considerations and shall be in the sole discretion of the Sponsor. In the event that Unsold Units are not offered for sale they may be rented at such rents as the Sponsor determines and market conditions allow. Prospective purchasers should also be aware that if the Unsold Units are not offered for sale and/or are subsequently rented, such decision by Sponsor may have an impact on the types of financing available to purchasers, the cost of such financing, and even, perhaps, on the availability of financing. Additionally, pursuant to the loan documents, the Sponsor may not lease any portion of the Property without the consent of its Lender. The policy of banks may vary and may involve restrictions in the types and varieties of loan terms available (such as the percentage of financing offered; fixed/variable; term of loan; verification requirements; etc.) to possible unwillingness to provide any financing. Prospective purchasers are advised to consult with their intended lenders/mortgage brokers with regard to the percentage of units which may be held as Unsold Units, and the lender's policies with regard to same, prior to entering into a contract to purchase a Residential Unit. The decision of Sponsor to withhold Residential Units from sale and/or rent same may continue to apply indefinitely and may have an adverse impact on the ability of a Residential Unit Owner to resell their Residential Unit and/or the price which they are able to obtain for the Unit.

Additionally, because the Sponsor is not limiting the conditions under which it will rent rather than sell Units, there is no commitment on the Sponsor's part to sell more Units than the fifteen percent (15%) necessary to declare the Offering Plan effective and as a result owner-occupants may never gain effective control of the Condominium. Further, pursuant to the terms of the Offering Plan and By-Laws of the Condominium, the Board of Managers has no right to approve or reject the sale of a Residential Unit to a prospective purchaser and therefore there is no limit as to the number of "investor" or "non-occupant owners" of Residential Units in the Building. However, as set forth in Article 2, Section 2.1.3 of the By-Laws of the Condominium which are set forth in Part II of the Offering Plan, subsequent to the date that the Sponsor, including any designee thereof, relinquishes control of the Board of Managers, all Board members, other than those members which the Sponsor or its designee have the right to appoint thereunder, must be either Residential Unit Owners or officers, directors, shareholders, partners, principals, members, trustees, employees or beneficiaries of corporations, partnerships, limited liability companies, fiduciaries or any other entities which own Residential Units, Recognized Residential Unit Mortgagees, provided that only one Owner of a Residential Unit may at any time serve on the Residential Board, and (b) all members of the Commercial Board shall be either a Commercial Unit Owner or officers, directors, shareholders, members, managers, shareholders, partners, principals, employees or beneficiaries of corporations, partnerships, fiduciaries or any other entities which may own a

16-17(1-2 Special Risks)

9

Commercial Unit or a managing agent for such Commercial Unit Owner or an employee thereof, Recognized Unit Mortgagees of the Commercial Units, lessees of the Commercial Units or portions thereof. In the event that the number of owner-occupants of the Condominium is insufficient to establish a majority of the Board Members, then, in such event, pursuant to the By-Laws any owner-occupant shall be entitled to one (1) seat on the Board of Managers.

16. Purchasers or any other persons entering into a lease or use and occupancy agreement for a Residential Unit shall be required to pay the legal fees of Sponsor's counsel in connection therewith upon execution of the lease or use and occupancy agreement. All other charges or other fees due under a lease or use and occupancy agreement shall be adjusted as of the Closing to the Unit. Notwithstanding any of the foregoing, Sponsor shall be under no obligation to enter into any lease or use and occupancy agreement. (See the Section entitled "Rights and Obligations of Sponsor").

17. All legal costs, fees and expenses charged by the Purchaser's attorney shall be the sole responsibility of each Purchaser. In addition, Purchaser shall also be responsible for payment of the following fees to Sponsor's attorneys, D'Agostino, Levine & Landesman, LLP, in connection with the closing of title to Purchaser's Unit: (i) the sum of $1,500 to reimburse Sponsor for its legal fees, (ii) if the Purchaser requests the Closing to occur other than at the offices of D'Agostino, Levine & Landesman, LLP or such other place as Sponsor may designate in its closing notice and Sponsor consents to such change, an attendance fee of $500 for each Closing held within Manhattan and $700 for each Closing held in any borough outside Manhattan, (iii) a fee to BPCA, in connection with the Closing and the issuance of the Recognition Agreement and related matters, initially in the amount of $250 (subject to increase), and (iv) if Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of the Purchase Agreement, or for the addition, deletion or substitution of names on the Purchase Agreement, a fee of $1,000, payable in advance, for preparation of an assignment agreement.

Please refer to the Section of the Plan entitled "Closing Costs and Adjustments" for further details.

18. It is currently contemplated, and the Budget for the First Year of Condominium Operation provides, that a uniformed doorman and/or concierge will be on duty at the Lobbies located in the West Wing and the South Tower of the Building twenty-four (24) hours a day, seven (7) days a week. The number and hours of duty of the doormen and concierge may be reduced until title to fifty (50%) percent of the Residential Units has been conveyed to Purchasers under the Plan; provided however, that there will be at least one doorman/concierge on duty twenty-four (24) hours a day, seven (7) days a week as of the First Closing. Please refer to the Budget for the First Year of Condominium Operation set forth as Schedule B to the Offering Plan for further details.

19. Purchasers should note that in the current real estate market, banks and other lenders may be imposing various restrictions on loans. Such restrictions include requiring that a certain percentage (such as 35% or 50%) of the units in a building be sold before the lender will consider making a loan. Thus it may be possible for a Purchaser to experience difficulty obtaining a loan in

16-17(1-2 Special Risks)

10

a building where the percentage of units purchased is lower than a lender's particular sales minimum. Even after the Property is converted to a condominium regime, lenders may still impose minimum sales requirements before granting a loan. It then may be difficult for a Purchaser to resell an apartment if prospective buyers are unable to obtain a loan due to such minimum sales requirements. Purchasers should further note that pursuant to Law, Sponsor may declare the Plan effective upon selling a minimum of fifteen (15%) percent of the Units offered for sale in the Building. Even if the Plan is declared effective with a minimum number of sales, it is possible that Sponsor may be able to convert the Property to a condominium regime and convey Units with fewer than the minimum number of sales if purchasers counted towards effectiveness do not ultimately purchase a Unit. Please refer to the Section entitled "Effective Date" in Part I of the Plan for further details.

20. Sponsor may agree in its sole and absolute discretion, to modify the floor plans and finishes of certain Residential Units or to do special work or provide extras to the Residential Units as requested by individual Purchasers and negotiated between Sponsor and Purchaser and agreed to by Sponsor in its sole discretion. Purchaser shall bear the cost of such modification to floor plans and finishes and any amendments required to the Plan and/or the Condominium or Tax Lot Drawings. All funds received by Sponsor from Purchasers for such modified or additional work in Units, as aforesaid, shall be initially placed in escrow and shall be paid to Sponsor by the escrow agent to be used by Sponsor to pay for such work. Accordingly, in the event a Purchaser becomes entitled to rescission after the release of such funds, the Purchaser shall not receive a refund of any funds used for special work or extras. Please refer to the Section of the Plan entitled "Procedure to Purchase" in Part I of the Plan for further details.

21. The Contingency provided for in the Projected Budget for the First Year of Condominium Operation (Schedule B) is intended to provide a fund for unanticipated expenses not included in the budgets and, for increases in operating expenses above the amounts projected. No other reserve fund for capital expenditures has been established. The Contingency is not intended and may not be sufficient to meet the cost of any major capital repairs or replacements which may be required. If funds are required to meet such costs, it may be necessary to increase Common Charges or institute a special assessment. See the Section of the Plan entitled "Working Capital Fund and Apportionment" for further discussion.

22. Sponsor shall not be obligated to correct, repair, or replace any and all defects relating to construction of the Residential Units, the Commercial Units, the General Common Elements, the Residential Common Elements and the Residential Limited Common Elements, or in the installation or operation of any appliances, fixtures, or equipment therein, except as expressly provided in this Plan. Sponsor will not warrant the materials or workmanship of any Unit or any of the Common Elements. The Housing Merchant Implied Warranty Law (General Business Law Article 36-B) is not applicable to this offering. See the Section of the Plan entitled "Rights and Obligations of Sponsor" under the Subsection entitled "Sponsor's Obligations With Respect to the Building" for further discussion. However, nothing herein shall be construed to limit any rights which the Attorney General may have under the Martin Act, Executive Law or any other applicable law or regulation.

16-17(1-2 Special Risks)

23. In order to meet the possible varying demand for number and type of Residential Units, or to meet particular requirements of prospective purchasers, or for any other reason, Sponsor reserves the right (except to the extent prohibited by law or the Lease) at any time and from time to time, before and after the recording of the Declaration, without giving prior notice and without the consent of any Board, Unit Owner or mortgagee, to (a) change the layout of; or number of rooms in, any Unsold Residential Unit, (b) change the size and/or number of Unsold Residential Units by dividing one or more such Units into two or more separate Unsold Residential Units, combining separate Unsold Residential Units (including those resulting from such subdivision or otherwise) into one or more Unsold Residential Units, altering any boundary walls between one or more Unsold Residential Units, or otherwise, including incorporating Common Elements (such as a portion of a hallway) which exclusively benefit an Unsold Residential Unit into such Unsold Residential Unit, (c) designate a Common Element as part of a newly created Residential Unit or Commercial Unit or designate all or part of a Residential Unit or a Commercial Unit as a newly created Residential Unit, Commercial Unit, Residential Common Element, Commercial Common Element or Limited Common Element and (d) if appropriate, reapportion among the Unsold Units affected by any such change, their aggregate Common Interests. Please see the Section of the Plan entitled "Changes in Prices and Units" for further details.

No change will be made in the size or number of Units and/or their respective percentages of Common Interest, and that no material change will be made in the size or quality of Common Elements, except by amendment to the Plan and, when applicable, to the Declaration.

Unless an affected Purchaser consents, no material change will be made in Unit size, layout, or percentage of Common Interest if a purchase agreement has been executed and delivered to the Sponsor for that Unit and the Purchaser is not in default.

Unless all Purchasers consent, no material change will be made in the size and no material adverse change will be made in the quality of Common Elements.

24. Each Purchaser will be obligated to enter into a power of attorney at the closing of title to the Unit. The form of power of attorney, grants broad powers to the Condominium Board and the Residential Board to enter into agreements affecting the General Common Elements and Residential Common Elements, as the case may be. The power of attorney also grants to Sponsor the right to amend the Condominium Declaration with respect to Unsold Residential Units and the Commercial Units. Please refer to the form of power of attorney set forth in its entirety in Part II of the Plan

25. Terraces appurtenant to certain Residential Units, as described in Schedule A and the Floor Plans set forth in Part II of the Plan, will be Residential Limited Common Elements available for the exclusive use of the Residential Unit Owners of such Residential Units. A Residential Unit Owner who has a Terrace appurtenant to such Unit Owner's Residential Unit shall have the exclusive use of same, subject to the right of the Condominium Board to regulate its use, and shall be responsible for all normal maintenance, repairs and replacements thereto. All maintenance, repairs and replacements to a Terrace shall be made in accordance with the Rules and Regulations of the

16-17(1-2 Special Risks)

12

Condominium and the Hugh L. Carey Battery Park City Authority Residential Environmental Guidelines dated December, 2003, as the same may hereafter be further amended, modified or supplemented. However, the costs and expenses of any structural repairs or repairs or replacements caused by the need for such structural repairs to any Terrace (unless caused by its Residential Unit Owner), shall be charged to all Residential Unit Owners as a Residential Common Expense. Cooling towers and other mechanical equipment necessary for the maintenance and operation of the Building and the Units will be located on the roof. Except as otherwise provided in the Declaration or By-Laws, the Condominium Board with respect to the Common Elements, the Residential Board with respect to the Residential Common Elements and Residential Limited Common Elements and the Commercial Board with respect to the Commercial Common Elements and Commercial Limited Common Elements, will be responsible for ensuring that the mechanical equipment is operated in accordance with Law, including requirements governing acceptable levels of noise and odor emissions. Sponsor is not responsible for, nor can Sponsor make any guarantees regarding the level or noise or odors resulting from the operation of the Building or the Units. In addition, Sponsor shall have, and the Units and Common Elements shall be subject to, an easement to use the Common Elements of the Building other than those portions of the roof which comprise Residential Limited Common Element Terraces for any lawful purposes including, but not limited to, the purposes of (a) installing, utilizing, operating, maintaining, repairing, altering, rebuilding, restoring and replacing satellite dishes and other communication equipment on the roofs and facade of the Building and elsewhere on the Common Elements and the conduit and other Facilities relating thereto and (b) maintaining any encroachment on any Unit, or any Common Elements or elsewhere on the Property resulting from the installation, operation, maintenance, repair, alteration, rebuilding, restoration or replacement thereof; provided that access to any Unit or Common Element in furtherance of such easements shall be exercised in a manner as will not unreasonably interfere with the normal conduct of business of the tenants and occupants of the Commercial Section or with the use of the Residential Units for their permitted purposes. The aforementioned easements may be used by Sponsor for its own account or the account of any assignee or licensee of Sponsor for the purpose of servicing the Condominium or any other building or area. The Condominium shall not be entitled to any portion of fees, compensation or other profits received by Sponsor for the use of the aforesaid easements or equipment. Any satellite dishes or other facilities placed upon any roof or facade of the Building or elsewhere on the Common Elements by Sponsor or its assignee or licensee shall be the exclusive property of Sponsor, its assignee or licensee and neither the Condominium nor any other Unit Owners shall have any rights with respect thereto. The Property is located in the Special Battery Park District A1, R10 Equivalent which permits residential, commercial and hotel uses. Under existing zoning there are no further development rights available to the Property and accordingly, a Purchaser of a Unit with a Terrace would not be able to add any additional structures thereon. Please see the Section of the Plan entitled "Rights and Obligations of Unit Owners and the Boards of Managers" under the subsection entitled "Easements" for further details. Neither Sponsor nor Sponsor's principals own, in whole or in part, or have any option to acquire, in whole or in part, any adjacent areas which are not fully developed.

26. Each Residential Unit Owner is obligated to notify the Managing Agent in writing when a child or children under the age of eleven (11) years lives or resides (even temporarily) in the Unit. Each Residential Unit Owner is obligated to install, at such Unit Owner's expense, the required

16-17(1-2 Special Risks)

window guards in all windows of the Residential Unit, to maintain all window guards installed in the Unit and not to remove same until permitted by Law and in any event, without full knowledge of the Managing Agent. Sponsor makes no representations whether Unit Owners will comply with the aforementioned obligations. See "Rights and Obligations of Unit Owners and the Boards of Managers" for further details.

27.     There is no provision for a specific reserve fund for the Condominium for the purpose of paying the cost of future capital repairs, replacements or improvements to the Property (except that each Purchaser of a Unit shall pay into the Working Capital Fund of the Condominium a sum of equal to one (1) month of Common Charges for the Unit being purchased). Therefore, Unit Owners shall be obligated to pay their share of the cost of repair, replacements and improvements to the Common Elements as the need for the same arises, unless there are sufficient Working Capital or other funds available. Since the Building will be newly built, Sponsor does not anticipate the imminent need for such capital repairs, replacements or improvements; however, no assurance or guaranty is given that such needs shall not arise in the future. See "Rights and Obligations of Unit Owners and the Board of Managers."

28.     Sponsor anticipates that the Condominium will not qualify as a homeowners association. Assuming the Condominium does not qualify as a homeowners association, or it does but chooses not to make the election to be a homeowners association, the current state of the law is uncertain as to the tax treatment of any income of the Condominium in excess of appropriate deductions and credits. As discussed in the Attorney's Income Tax Opinion, the tax authorities may take the position that the Condominium is a separate taxable entity and that some or all of such income (including the nonmembership, and possibly membership, income described above less expenses related to such income) is subject to Federal corporate income tax, New York State Corporation Franchise Tax and New York City Corporate Franchise or Unincorporated Business Tax. Schedule B, Budget for the First Year of Condominium Operation, does not contemplate any income which might be taxable and accordingly does not budget any amounts for taxes for nonmembership or membership income. Alternatively, it is possible that some or all of such income might be reportable directly, or treated differently by, the Unit Owners. The tax treatment of the Condominium may be affected by certain United States Treasury Department regulations relating to entity classification. Please refer to the Attorney's Income Tax Opinion and the Section entitled "Taxes—Deductions to Residential Unit Owners and Tax Status of Condominium" in Part I of the Plan for further discussion.

29.     While Unsold Residential Units are being offered for sale or lease by Sponsor or its designees there will be a greater number of visitors to the Residential Section than would otherwise be the case. No representation or warranty is made and no assurance is given as to when such selling or leasing activity will terminate. Neither Sponsor or its designee nor the Managing Agent shall be liable or responsible for any personal injury or for any loss or damage to personal property which may result from the failure of the Residential Section's or the Condominium's security systems and procedures, including, without limitation, those procedures with regard to any delivery of packages, provided that any such failure is not caused by the negligence of Sponsor or its designees, the Managing Agent or their respective agents. No representation or warranty is made and no assurance is given that the security systems and procedures of the Residential Section and of the Condominium

16-17(1-2 Special Risks)

14

will prevent personal injury or damage to or loss of personal property. Please refer to the Section of the Plan entitled "Description of Property and Improvements" under the subsection entitled "General" for further details.

30. Sponsor makes no representations or warranties regarding building construction in the area of the Condominium. Purchasers are advised that adjacent parcels or buildings may be further developed by developers designated by BPCA and such development could adversely impact upon the views from a Residential Unit.

31. All determinations with respect to the continuance of services provided to the Residential Section, if initially made available, will be made by the Residential Board or the Condominium Board (which will be Sponsor during the Sponsor Control Period as described in the Section of the Plan entitled "Control by Sponsor") Please refer to the "Description of Property" set forth in its entirety in Part I of the Plan under the subsection entitled "Services and Facilities" for further details regarding services and facilities at the Property.

32. To secure the obligations of the Residential Unit Owners under the Lease, including Sponsor or its designee as owner of Unsold Residential Units, immediately prior to the First Closing, Sponsor shall deposit with BPCA, cash in the amount equal to $5,919,492 (the "Security Fund Amount") which is an estimate of the Proportionate Rent due from all Residential Unit Owners for a one (1) year period as of the Determination Date (as hereinafter defined). Under the terms of the Lease, the Security Fund Amount will be recalculated to reflect the PILOT due based upon the actual aggregate assessment of each Residential Unit as of the date a temporary certificate of occupancy has issued for all of the Units and such Units have been separately assessed (the "Determination Date"). The Security Fund Amount and any interest or income earned thereon are referred to herein as the "Security Fund." In the event that the actual assessments of the Residential Units as of the Determination Date are higher than originally estimated, the Condominium Board will be required to deposit the shortfall into the Security Fund. In such event the Condominium Board may be required to assess Residential Unit Owners. In the event that the actual aggregate assessments of the Residential Units as of the Determination Date are lower than originally estimated, BPCA will reimburse the excess to the Condominium Board and the Condominium Board shall allocate and distribute the reimbursement to each Residential Unit Owner pro rata in accordance with their respective Residential Common Interests. Upon the acquisition of title from Sponsor, a Purchaser of a Residential Unit will reimburse Sponsor for its contribution to the Security Fund in an amount equal to the annual Residential Proportionate Rent estimated as of the First Closing. The estimated monthly Residential Proportionate Rent for each Residential Unit is set forth on the Schedule of Security Fund Contributions in Part I of the Plan.

33. All kitchens and bathrooms are handicapped adaptable in accordance with Local Law 58 through appropriate enhancement of the substructure. Certain adaptability provisions, especially those that are visible in nature, have not been provided. In the event that a handicapped conversion in accordance with Local Law 58 is needed, the cost of adapting these spaces shall be borne by the Sponsor in the case of first sale and by the Purchaser for all future sales.

34. The cost of management as set forth in the budget for the first year of condominium operation is based upon a proposed management agreement with Sheldrake Management LLC ("Managing Agent") for a term of two (2) years, commencing on the date of the First Unit Closing, at an annual fee of $90,000.00, payable in twelve (12) equal monthly installments of $7,500. The principal of the Managing Agent, J. Christopher Daly, is the Managing Member of the principal of the Sponsor. In view of the relationship between the Managing Agent and Sponsor, the interests of the Managing Agent in performing services may conflict with the interests of the Board of Managers.

The management agreement shall be subject to the right of the Tenant to cancel at any time upon at least sixty (60) days' prior written notice. Further, subsequent to the first two years of its term, it shall be subject to the right of the Board or the Managing Agent to cancel the agreement at any time upon thirty (30) days' prior written notice. After the term of the management agreement has expired it will be automatically renewed from month to month unless terminated by either the Board or the Managing Agent on thirty (30) days' prior written notice. The Management Agreement may not be assigned.

35. Battery Park City, created and designed in accordance with Battery Park City Authority's 1979 Master Plan is acknowledged to be the most ambitious 'urban mixed-use community currently under development in the United States. It is also the single largest development in downtown New York. The Battery Park City Master Plan provides for the design of a street system that forms small and varied blocks, similar to those of lower Manhattan. When completed, it will include more than 14,000 residential units, 6,000,000 square feet of office space and 250,000 square feet of retail space and parking facilities. The Condominium is a part of the Battery Park City Development, which is currently under construction.

36. The Condominium Board shall also pay to BPCA, upon the transfer of each Residential Unit after the initial transfer of such Unit, an amount ("Flip Tax Payment") equal to one percent (1%) of the Gross Sales Price of such Unit.

The effectiveness of a transfer of a Unit is conditioned upon the making by Sponsor or the Condominium Board as successor Tenant, of a Transaction Payment, a Flip Tax Payment, or, if then payable, the Additional Transaction Payment Escrow Amount into escrow.

37. If the Building is destroyed or damaged in whole or in part, such fact shall not relieve Tenant from its obligations under the Lease, including but not limited to the payment of Rent and other sums or charges without abatement of any kind. For further details see "Summary of the Lease" located in Part I of the Plan.

38. Purchasers should note that the square footage of each Residential Unit as reflected in Schedule A and the Floor Plans set forth in Part II of the Plan is approximate and may change due to field conditions and construction variances and tolerances. No such variation will affect a Purchaser's obligations under a Purchase Agreement or the Plan unless the net square footage area of the Unit is diminished by more than 5%. Sponsor's sole obligation if the square foot area is diminished by more than 5% shall be to refund to Purchaser the Down Payment made under the Purchase Agreement and any interest earned thereon. Each Unit will be measured horizontally from

the outside face of the exterior walls of the building to the centerlines of the drywall partitions separating one Space from another Space or Mechanical Equipment Space, to the corridor side face of Public Corridors, or to the face of the concrete shear walls of the Elevators/Stairs Core which are adjoining the Space. Areas are measured on a median in the case of non-orthogonal spaces. Since the areas listed in Schedule A were not calculated from measurements from the interior surfaces of interior walls, the actual floor areas of the Units may be significantly less than the areas listed in Schedule A.

39.     The Sponsor has constructed the foundation of the Building to include vault space, which vault space is subject to the approval of the New York City Department of Buildings and the New York City Department of Transportation. Sponsor has received the approval of the vault space by the Department of Buildings and is awaiting approval by the Department of Transportation. As set forth in the Condominium Declaration located in Part II of the Plan, a portion of the General Common Elements, the Commercial Limited Common Elements and the Residential Limited Common Elements are located in whole, or in part, in the vault space. Should the Department of Transportation not approve the vault space, Sponsor will be required to in-fill the vault space and the facilities located therein, such as the laundry room and a portion of the bicycle room and any mechanical equipment located therein, will have to be relocated within the boundaries of the Building which is currently part of the Garage Unit. As a result of any said relocation any portion of the Garage Unit, which will be provided by the Sponsor, used for the relocation of General Common Element, Commercial Limited Common Element and Residential Limited Common Element shall become General Common Element, Commercial Limited Common Element and Residential Limited Common Element, as the case may be.

Provided the Department of Transportation approval is obtained, BPCA intends to dedicate the vault space to the City of New York and the Condominium shall be entitled to use of the vault space pursuant to a revocable license with the City of New York. Any license fees and all periodic taxes or charges related to the street vaults shall be a Common Charge payable by the Commercial Unit Owner for the vault space which is a Commercial Limited Common Element and by the Residential Unit Owner as a Common Charge.

Currently, the City of New York does not impose a license fee, tax or other charge related to street vaults.

40.     For a period of five years from the First Closing (the "Discount Term"), Sponsor has agreed to reduce the Residential Common Charges payable by each Residential Unit Owner by contributing the aggregate sum of $13,000,000 (the "Discount"). Sponsor's obligation to pay the Discount is not secured by any bond or other security. Notwithstanding the foregoing the Sponsor represents that it has the financial ability to fund the Discount. The Discount shall be paid monthly to the Condominium Board in the following amounts:

| Year 1 | - $2,500,000 per annum |
| Year 2 | - $3,000,000 per annum |
| Year 3 | - $2,500,000 per annum |
| Year 4 | - $2,250,000 per annum |

| Year 5 | - | - $1,500,000 per annum |
| Year 6 | | - $1,250,000 per annum |

The first year of the Discount will reduce the Residential Common Charges payable by the Residential Unit Owner by approximately fifty percent (50%). Should Sponsor fail to fund the Discount the Residential Common Charges for the First Year of Operation shall increase by approximately fifty percent (50%). After the expiration of the Discount the Residential Common Charges payable by the Residential Unit Owners shall substantially increase. No portion of the "Discount" shall be deemed to apply to the PILOT allocable to each Residential Unit. The Discount shall be paid in equal monthly installments by Sponsor except that the first and last payment shall be prorated on the basis of the day of the month in which the First Closing occurs. The Residential Common Charges due from each Residential Unit Owner during the first year of Condominium operation, after receipt of the monthly payment of the Discount is set forth on the Schedule A. If a Residential Unit Owner sells such Unit Owner's Residential Unit during the Discount Term the purchaser thereof shall be entitled to the benefits of the Discount for the balance of the Discount Term. Each Residential Unit Owner will receive a monthly credit against the Residential Common Charges otherwise due during the Discount Term.

## INTRODUCTION

Site 16/17 Development LLC, a New York limited liability company ("Sponsor"), hereby presents this offering plan (the "Plan") for the conversion to leasehold condominium ownership of the land (the "Land") together with the building erected thereon known as and having a street address of Riverhouse on Rockefeller Park, Battery Park City, New York, New York 10282, (the "Building"), containing two hundred sixty-four (264) residential units (the "Residential Units") and five (5) commercial units (the "Commercial Units"). The Land and the Building are collectively referred to herein as the "Property." The Property is located within Battery Park City, a 92 acre project more fully described in the Section of the Plan entitled "Battery Park City Authority and the Project Area." The condominium will be known as "Riverhouse on Rockefeller Park" and is herein called the "Condominium" in the Plan.

The purpose of the Plan is to set forth in detail all material facts relating to the offering by Sponsor of 264 Residential Units including a Resident Manager's Unit. Sponsor is not offering the five (5) Commercial Units for sale at this time. Sponsor reserves the right to divide the Commercial Units without amendment to the Plan and to offer the Commercial Units for sale by amendment to this Plan, all with the consent of BPCA. Sponsor may from time to time amend or supplement the Plan by filing an amendment with the New York State Department of Law (the "Department of Law") and serving such amendment on Purchasers and Unit Owners. It is contemplated that at, or subsequent to the First Unit Closing, Sponsor shall convey the World Hunger Education Center Unit, the Public Library Unit and the Poet's House Unit to BPCA.

The Plan is presented in two parts (in one volume) which together constitute the entire Plan. Part I sets forth a general description of the Plan and Part II contains the basic documents necessary to create the Condominium and to otherwise effectuate the provisions of the Plan. Also included in Part II is a detailed physical description of the Property, certifications of Sponsor and Sponsor's architect, certifications of an expert selected by Sponsor concerning the adequacy of the budget for the first year of Condominium operation and certain agreements to which the Condominium will be bound. In addition, Sponsor has filed exhibits to the Plan with the Department of Law, which are presented as Parts A (Certifications), B (General), C (Engineering) and D (Other Information). The Plan, including all Schedules set forth herein and Parts A, B, C and D of the exhibits, constitutes the entire offer of Sponsor. Copies of the Plan and the exhibits will be available for inspection by prospective Purchasers without charge at Sponsor's office and may be borrowed upon payment of a one hundred ($100) dollar deposit, which amount will be fully refunded upon either (i) the prompt return of all borrowed materials in good condition or (ii) the execution by the borrower of a Purchase Agreement subsequently accepted by Sponsor. All of these documents are important and should be carefully read by prospective purchasers. Prospective purchasers are also advised to consult with their own attorneys or other advisers before agreeing to purchase. All capitalized terms used in the Plan shall have the meanings ascribed thereto in the Section entitled "Certain Definitions," unless otherwise indicated.

16-17(I-3 Introduction)

It is noted that although it is the intent of Sponsor that all Residential Units be offered for sale pursuant to the terms of the Offering Plan, Sponsor has reserved the unconditional right to withhold certain Residential Units from sale. In the event that the Sponsor withholds one (1) or more of the Residential Units from sale, Sponsor shall amend the Plan to disclose which Units are being withheld. If Sponsor leases certain Residential Units to tenants and such Units are subsequently offered, Sponsor shall amend the Plan, accordingly, if such Units are offered subject to such tenancies.

Although Sponsor shall make a good faith effort to sell the Residential Units to purchasers who will occupy their Units as their personal residences ("owner-occupants"), prospective purchasers should be aware that the decision to sell, not to sell or rent any Unit shall be made by the Sponsor based upon its evaluation of market conditions and its own financial considerations and shall be in the sole discretion of the Sponsor. In the event that Unsold Units are not offered for sale they may be rented at such rents as the Sponsor determines and market conditions allow. Prospective purchasers should also be aware that if the Unsold Units are not offered for sale and/or are subsequently rented, such decision by Sponsor may have an impact on the types of financing available to purchasers, the cost of such financing, and even, perhaps, on the availability of financing. Additionally, pursuant to the loan documents, the Sponsor may not lease any portion of the Property without the consent of its construction lender. The policy of banks may vary and may involve restrictions in the types and varieties of loan terms available (such as the percentage of financing offered; fixed/variable; term of loan; verification requirements; etc.) to possible unwillingness to provide any financing. Prospective purchasers are advised to consult with their intended lenders/mortgage brokers with regard to the percentage of units which may be held as Unsold Units, and the lender's policies with regard to same, prior to entering into a contract to purchase a Unit. The decision of Sponsor to withhold Units from sale and/or rent same may continue to apply indefinitely and may have an adverse impact on the ability of a Unit Owner to resell their Unit and/or the price which they are able to obtain for the Unit. If Sponsor makes a bulk sale of all or some of its Unsold Units, the transferee successor sponsor is bound by Sponsor's representations regarding its commitment to sell units.

Additionally, because the Sponsor is not limiting the conditions under which it will rent rather than sell Units, there is no commitment on the Sponsor's part to sell more Units than the fifteen percent (15%) necessary to declare the Offering Plan effective and as a result owner-occupants may never gain effective control of the Condominium. Further, pursuant to the terms of the Offering Plan and By-Laws of the Condominium, the Board of Managers has no right to approve or reject the sale of a Unit to a prospective purchaser and therefore there is no limit as to the number of "investor" or "non-occupant owners" of Units in the Building. However, as set forth in Article III, Section 1.(b) of the By-Laws of the Condominium which are set forth in Part II of the Offering Plan, subsequent to the date that the Sponsor, including any designee thereof, relinquishes control of the Board of Managers, all Board members, other than those members which the Sponsor or its designee have the right to appoint thereunder, must be owner-occupants of the Condominium who are not related to Sponsor or the principals of Sponsor. In the event that the number of owner-occupants of the Condominium is insufficient to establish a majority of the Board Members, then,

16-17(1-3 Introduction)

in such event, pursuant to the By-Laws any owner-occupant shall be entitled to one (1) seat on the Board of Managers.

## The Condominium

On or about June 30, 2004, Sponsor was designated by the Battery Park City Authority ("BPCA") as the developer of a mixed use leasehold condominium project in the North Residential neighborhood of the project area known as "Battery Park City." In furtherance thereof, Sponsor has entered into a ground lease for the Property with BPCA (the "Lease"). Please refer to the Sections of the Plan entitled "Battery Park City Authority and the Project Area" and "Summary of the Lease" for a further description of the BPCA, Battery Park City and the terms of the Lease. Sponsor will submit its leasehold estate in the Property to a condominium regime by filing the Declaration.

As more particularly described herein, the Building will be "u" shaped with a thirteen (13) story east wing, a fifteen (15) story west wing and a thirty-one (31) story tower at its southerly base. the Building will include (a) a Residential Section which will contain the Residential Units, the Residential Common Elements and the Residential Limited Common Elements and (b) a Commercial Section, which will contain the Commercial Units, the Commercial Common Elements and the Commercial Limited Common Elements. The Commercial Units will occupy portions of the subcellar, cellar, first floor and floor 2 of the Building. The Residential Units will occupy floors 3 through 32. The Resident Manager's Unit will be on Floor 2 of the Building. There is no floor designated as the 13th floor in the Building.

There will be available to occupants of the Residential Section, certain luxury apartment type services, including, but not limited to, 24-hour doorman service, automatic elevators, cable television service, security systems and communication facilities. Please refer to the Section of the Plan entitled "Description of Properties and Improvements" under the Subsection entitled "Services and Facilities" for further details. Sponsor does not warrant or guarantee that all of the foregoing services will be available until the earlier to occur of the closings of title to fifty (50%) percent of the Residential Units or the second anniversary of the First Closing.

The Commercial Section will include five (5) Units: the Garage Unit located on portions of the subcellar and cellar levels of the Building; the Café Unit located on a portion of the southerly side of the Building at the First Floor; the World Hunger Education Center Unit located on a portion of the westerly side of the Building at the First Floor; the Poets House Unit located on a portion of the westerly side of the Building at the First Floor; and the Public Library Unit located on a portion of the easterly side of the Building on Floor 2. Under the terms of the Declaration the Commercial Units may be used for any lawful purposes, including, without limitation, use as a library, community center, eating and drinking establishments, retail stores and outlets, storage, theaters, banks, restaurants and commercial and professional offices and studios. In accordance with the terms of the Lease, unless BPCA approves otherwise, the World Hunger Education Center Unit, the Poets House Unit and the Public Library Unit may only be used as a cultural facility or publicly oriented amenity approved by BPCA.

16-17(1-3 Introduction)