## Features of Condominium Ownership

The ownership of a leasehold condominium unit is similar in certain respects to the ownership of a private home. Each Residential Unit Owner will own a condominium leasehold interest in such Unit Owner's Residential Unit and is entitled to the exclusive possession thereof and the exclusive use of the Residential Limited Common Elements, if any, appurtenant to such Unit Owner's or his Unit. A Residential Unit Owner also owns, in common with the owners of all other Residential Units, an undivided leasehold interest in (and right to use) the Residential Common Elements, and, in common with the owners of all other Units, an undivided leasehold interest in (and right to use) the General Common Elements. Please refer to the Sections of the Plan entitled "Special Risks" and "Summary of the Lease" under the Subsection entitled "Term" for a discussion of the term of the Lease and the consequences of the termination thereof.

Certain Residential Unit Owners have exclusive use of Terraces appurtenant to their Residential Units, and such Unit Owners are responsible for all normal maintenance, repairs and replacements thereto subject to the Rules and Regulations of the Condominium and the Hugh L. Carey Battery Park City Authority Residential Environmental Guidelines dated December, 2003, as the same may hereafter be further amended, modified or supplemented. Terraces appurtenant to Residential Units are shown on the Residential Unit Floor Plans included in Part II of the Plan. However, the costs and expenses of any structural or extraordinary repairs or replacements to any Terrace caused by the need for such structural repairs (unless caused by a Residential Unit Owner) shall be charged to all Residential Unit Owners as a Residential Common Expense. The type, size and quantity of plantings and other installations to be placed on Terraces and the rights of Unit Owners to paint and decorate Terraces and place furniture thereon, shall be subject to the prior written approval of the Condominium Board and the Rules and Regulations.

Subject to certain conditions contained in the By-Laws and the Lease, each Residential Unit Owner may mortgage such Unit Owner's Residential Unit(s) with such lender and in such amount as the Unit Owner chooses. However, Sponsor makes no representations about the ability to finance any Residential Unit. Any mortgagee making a mortgage secured by a Unit will be required to enter into a recognition agreement with the Condominium Board, the Purchaser and BPCA, as required by BPCA, acknowledging and agreeing to the terms of the Lease and agreeing to subordinate the lien of the mortgage as more fully described in the Section of the Plan entitled "Summary of the Lease" under the Subsection entitled "Sale and Mortgaging of Units." Each Unit is separate and is not subject to the lien of any mortgage placed by other Unit Owners on their respective Units.

A Residential Unit Owner may decorate the interior of such Unit Owner's Residential Unit in any way desired except as otherwise provided herein, subject to compliance with the By-Laws, the Rules and Regulations and Law, and will be solely responsible for the cost of maintenance and interior repairs to such Unit Owner's Residential Unit after Closing. The Residential Board may not limit or restrict the rights of the Commercial Unit Owners to decorate the Commercial Units.

Each Unit will be taxed as a separate tax lot for PILOT purposes, and no Unit Owner will be responsible for the payment of, nor will such Unit Owner's Unit be subjected to any lien arising from

16-17(1-3 Introduction)

the non-payment of, PILOT on other Units. Please refer to the opinion of D'Agostino, Levine & Landesman, LLP, counsel to Sponsor, set forth in full in Part I of the Plan, for a discussion regarding the deductibility for federal, New York State and New York City income tax purposes, of PILOT and the interest paid on a mortgage, if any, on a Residential Unit.

With certain exceptions (for example, Sponsor and its designees are not required to give the Residential Board a right of first refusal with respect to any Unsold Residential Units), any sale or lease of a Residential Unit, will be subject to a right by the Residential Board to acquire or lease such Residential Unit or to produce a third party to acquire or lease such Residential Unit on the same terms as were offered by the owner of such Residential Unit. For a more complete discussion of the foregoing, see the Section entitled "Rights and Obligations of Unit Owners and the Boards of Managers" under the subsection entitled "Sales and Leases of Units" and the Section entitled "Summary of the Lease".

The statute concerning condominiums in effect in the State of New York pursuant to which the Condominium will be organized is Article 9-B of the Real Property Law of the State of New York, as amended, commonly known, and hereinafter referred to as the "Condominium Act." The Property will become a "qualified leasehold condominium" pursuant to the provisions of the Condominium Act by Sponsor's recording of the Declaration in the City Register's Office. From and after the date of recording the Declaration, Sponsor will be the owner of each of the Units until each is sold or conveyed. The Condominium will comply with all statutes and regulations applicable to condominiums in the State of New York.

Generally, the cost of operating the Residential Common Elements will be borne by the Residential Units Owners in proportion to their respective Residential Common Interests and the cost of operating the Commercial Units will be borne entirely by the Commercial Unit Owners. Residential Unit Owners, as such, will have no interest in any rents, profits or revenues derived from the rental or use of any space in the Commercial Units and the Commercial Unit Owners, as such, will have no interest in any rents, profits or revenues derived from the rental or use of any space in the Residential Section. The costs and expenses of operating and maintaining the General Common Elements will generally be shared by all Unit Owners in proportion to their respective Common Interests except as otherwise provided in Schedule B-"Projected Budget for First Year of Condominium Operation" in Part I of the Plan or in accordance with the terms of the By-Laws. The Condominium Board and the Residential Board may make allocations of General Common Expenses and Residential Common Expenses in accordance with submetering, contract allocations and usage (both projected and actual) so long as such allocations are reasonable under the circumstances and are in accordance with law. The Condominium Board cannot change the method of allocation of Common Expenses or increase the number of building employees servicing the Commercial Units as set forth in Schedule B, without the consent of the Commercial Board. Please refer to Schedule B-"Projected Budget for First Year of Condominium Operation" and the Section of the Plan entitled "Commercial Units" in Part I of the Plan for further details.

The Rent payable under the Lease is a Common Expense of the Condominium. That portion of the Rent which constitutes Commercial Unit Proportionate Rent will be payable by the

16-17(1-3 Introduction)

Commercial Unit Owners. That portion of the Rent which constitutes Residential Proportionate Rent shall be payable solely by the Residential Unit Owners. The Lease provides that the Condominium will also be responsible for operating and maintaining the Tenant's Civic Facilities. Please refer to the Section of the Plan entitled "Summary of the Lease" and Schedule B - "Projected Budget for First Year of Condominium Operation," for further details.

From and after the First Closing, the Condominium Board becomes the tenant under the Lease responsible for complying with all of the terms and conditions thereof. Except as provided in the Declaration, By-Laws or the Lease, the Residential Board will be responsible for deciding all matters solely concerning the Residential Section. The Commercial Board will be responsible for deciding all matters solely concerning the Commercial Section. Matters affecting both the Residential Section and the Commercial Section or affecting the General Common Elements, including without limitation, determinations regarding compliance with the terms of the Lease, the exterior façade or the appearance of the Building, will be decided by the Condominium Board, which shall be comprised of representatives of the Residential Board and of the Commercial Board. Sponsor will control the Residential Board for so long as Sponsor's designees receive a majority of the total votes cast at such meeting or until the expiration of five (5) years from the First Closing, whichever is later. Please refer to the Section of entitled "Control by Sponsor" in Part 1 of the Plan for further details.

As more particularly set forth in the By-Laws, the Condominium Board will determine the amount of General Common Expenses, the amount of Commercial Unit Proportionate Rent due from each of the Commercial Unit Owners and the amount of the Residential Proportionate Rent due from each Residential Unit Owner to satisfy the obligations to pay Rent under the Lease. The Residential Board will determine the amount of Residential Common Expenses. The Residential Proportionate Rent (which is included in the Residential Common Charges payable by each Residential Unit Owner) include (i) the PILOT attributable to each Residential Unit; (ii) the Residential Base Rent multiplied by the Residential Common Interest of the Residential Unit, (iii) that portion of the Civic Facilities Payments allocated to the Residential Section multiplied by the Residential Common Interest of the Residential Unit and (iv) any Default Costs (as hereinafter defined) attributable to or assessed against such Residential Unit Owner. The Commercial Common Charges payable by the Commercial Unit Owners, include each Commercial Unit's allocable share of operating expenses and Proportionate Rent" which is the sum of: (i) Base Rent, (ii) the Civic Facilities Payments, (iii) Percentage Rent, (iv) the PILOT allocable to the Commercial Units, and (v) any Default Costs attributable to or assessed against any the Commercial Unit Owners. In addition, the Café Unit Owner shall pay the Net Non-Residential Rent as part of its Proportionate Rent payment. Please refer to the Section of the Plan entitled "Summary of the Lease" under the Subsection entitled "Base Rent and Rent" for further details regarding the Rent due and payable under the Lease. On a monthly basis or at such other times as the Residential Board determines, the Residential Board will assess Residential Unit Owners for Residential Common Charges to meet Residential Common Expenses and the Residential Board's pro rata share of General Common Charges (including without limitation the Residential Proportionate Rent attributable to the Residential Units). Residential Common Expenses will be allocated against Residential Unit Owners in proportion to their respective Residential Common Interests except as otherwise determined by the Condominium Board or the

16-17(1-3 introduction)

Residential Board in accordance with the Condominium Act, Sections 339-(i) and (m). After the Residential Units have been separately assessed by the New York City Department of Finance ("DOF"), each Residential Unit will pay PILOT in an amount determined by multiplying the assessed valuation of such Residential Unit Owner's Unit (as determined by DOF) by the tax rate then in effect for individual residential condominium units.

The cost of improvements, repairs, replacements, alterations and additions to the Residential Section will be Residential Common Expenses which will be determined by the Residential Board and assessed against all Residential Unit Owners in proportion to their respective Residential Common Interests. The estimated Residential Common Charges for each Residential Unit for the first year of condominium operation are set forth in Schedule A.

For a period of five years from the First Closing (the "Discount Term"), Sponsor has agreed to reduce the Residential Common Charges payable by each Residential Unit Owner by contributing the aggregate sum of $13,000,000 (the "Discount"). Sponsor's obligation to pay the Discount is not secured by any bond or other security. Notwithstanding the foregoing the Sponsor represents that it has the financial ability to fund the Discount. The Discount shall be paid monthly to the Condominium Board in the following amounts:

| | |
|---|---|
| Year 1 | - $2,500,000 per annum |
| Year 2 | - $3,000,000 per annum |
| Year 3 | - $2,500,000 per annum |
| Year 4 | - $2,250,000 per annum |
| Year 5 | - $1,500,000 per annum |
| Year 6 | - $1,250,000 per annum |

The first year of the Discount will reduce the Residential Common Charges payable by the Residential Unit Owner by approximately fifty percent (50%). Should Sponsor fail to fund the Discount the Residential Common Charges for the First Year of Operation shall increase by approximately fifty percent (50%). After the expiration of the Discount the Residential Common Charges payable by the Residential Unit Owners shall substantially increase. No portion of the "Discount" shall be deemed to apply to the PILOT allocable to each Residential Unit. The Discount shall be paid in equal monthly installments by Sponsor except that the first and last payment shall be prorated on the basis of the day of the month in which the First Closing occurs. The Residential Common Charges due from each Residential Unit Owner during the first year of Condominium operation, after receipt of the monthly payment of the Discount is set forth on the Schedule A. If a Residential Unit Owner sells such Unit Owner's Residential Unit during the Discount Term the purchaser thereof shall be entitled to the benefits of the Discount for the balance of the Discount Term. Each Residential Unit Owner will receive a monthly credit against the Residential Common Charges otherwise due during the Discount Term.

The Commercial Board will be responsible for collecting all sums necessary to meet the obligations of the Commercial Section including, without limitation, payment of its pro rata share of General Common Charges. In the event a Unit Owner fails to make payments of Residential Common Charges, the Residential Board and the Condominium Board shall each have a lien under Real Property Law ("RPL") § 339-z against such defaulting Unit Owner's Unit for collection of

unpaid Residential Common Charges and related expenses. In addition, in the event that any Board fails to prosecute such liens, BPCA will have the right to pursue such remedies in the place and stead of any Board.

After the closing of title to a Residential Unit, a Residential Unit Owner will be solely responsible for maintaining casualty insurance with respect to everything within the Unit from the outside surface of the sheetrock walls including, without limitation, the wall coverings, flooring, appliances, fixtures, equipment and personal property and improvements and betterments situated within such Unit Owner's Residential Unit, as well as liability insurance with respect to occurrences in or about such Unit Owner's Residential Unit. The By-Laws require that each Unit Owner maintain such insurance coverage. The Condominium Board will be solely responsible for maintaining casualty and liability insurance with respect to the Common Elements, in accordance with the provisions of the By-Laws. See the Section entitled "Rights and Obligations of Unit Owners and the Boards of Managers" for a more complete discussion of the foregoing.

There are no limitations on who may purchase a Residential Unit. Under the New York Real Property Law, a condominium unit may be owned by an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity which is permitted to take title pursuant to New York law. Sponsor anticipates that it may sell Residential Units to corporate or other business entities, which may use such Residential Units to house officers, directors, shareholders, members, principals, employees, clients and other individuals affiliated in some way with such business entities. Notwithstanding the foregoing, Sponsor is not obligated to offer or sell any Residential Units and may, if it chooses, withhold one or more Residential Units for future sale by amendment to the Plan. Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, without the consent of any of the Boards, any Residential Unit Owner, or mortgagee, to refuse to approve and execute a Purchase Agreement for any Residential Unit; provided, however, that Sponsor shall not discriminate against any person because of race, creed, color, sex, sexual orientation, disability, marital status, age, ancestry, national origin or other grounds proscribed by law. No binding obligation will arise for the sale of a Residential Unit unless and until a Purchase Agreement executed by both Purchaser and Sponsor has been exchanged and Sponsor has collected the funds constituting Purchaser's required Down Payment thereunder (see the Section entitled "Procedure to Purchase" for more details). Sponsor will not accept an offer of purchase from an individual younger than eighteen (18) years of age or an incompetent under law.

THE PURCHASE OF A CONDOMINIUM HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES AND MAY BE ONE OF THE MOST IMPORTANT FINANCIAL TRANSACTIONS OF YOUR LIFE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING AN AGREEMENT TO PURCHASE A CONDOMINIUM.

DETERMINATION BY BATTERY PARK CITY AUTHORITY THAT THIS PLAN AND THE DECLARATION AND BYLAWS OF THE CONDOMINIUM CONFORM TO THE

16-17(1-3 Introduction)

PROVISIONS OF THE LEASE DOES NOT MEAN THAT BATTERY PARK CITY AUTHORITY HAS APPROVED THIS OFFERING.

EACH UNIT OWNER IS REQUIRED TO PAY, AS A PART OF SUCH UNIT OWNER'S COMMON CHARGES, PROPORTIONATE RENT WHICH IS DUE AND PAYABLE TO BATTERY PARK CITY AUTHORITY AS LANDLORD UNDER THE LEASE. SUBMISSION OF THE SPONSOR'S LEASEHOLD ESTATE IN THE LAND AND THE BUILDING TO A CONDOMINIUM FORM OF OWNERSHIP DOES NOT DIMINISH OR IMPAIR ANY OF LANDLORD'S RIGHTS AGAINST A UNIT OWNER WHO FAILS TO PAY SUCH UNIT OWNER'S PROPORTIONATE RENT OR OTHERWISE DEFAULTS UNDER ANY OF THE TERMS OR CONDITIONS OF THE LEASE OR THE CONDOMINIUM DOCUMENTS.

### Offering of Units for Sale

Sponsor hereby offers 264 Residential Units to Purchasers for sale under the Plan. The prices for each of the Residential Units offered under the Plan are listed in Schedule A entitled "Purchase Prices and Related Information for the Projected First Year of Condominium Operation." THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY ANY GOVERNMENTAL AGENCY.

The estimated Residential Common Charges for each Residential Unit for the first year of operation of the Property as a condominium are also set forth in Schedule A and each Residential Unit Owner will receive a credit against such Residential Common Charges in the form of Sponsor's Discount which will be utilized to lower the monthly Residential Common Charges due from each Residential Unit Owner during the Discount Term as more particularly described above. Sponsor's obligation to pay the Discount is not secured by any bond or other security.

Each Purchaser of a Residential Unit will be required to make a contribution to the Working Capital Fund of the Residential Section. Such contribution, to be made at the time of Closing of the Residential Unit, shall be in an amount equal to one (1) month's Residential Common Charges in effect at the time of closing for each Residential Unit purchased. (See the Section entitled "Working Capital Fund and Apportionments"). Each Purchaser will incur other expenses in connection with the acquisition of a Residential Unit as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments."

The Residential Common Charges include PILOT, which will be separately assessed against such Unit Owner's Residential Unit and payable to the Condominium Board by each Residential Unit Owner in accordance with such assessment. In addition to the Residential Common Charges, each Residential Unit Owner will be responsible for the, interest and amortization payments on the mortgage, if any, which such Purchaser may, at such Purchaser's option, obtain, and charges for electricity consumed in such Unit Owner's Residential Unit and the costs for telephone, cable and similar services.

16-17(1-3 Introduction)

The charges for electricity consumed by each Unit Owner individually will be separately submetered and billed directly to such Unit Owner by a third-party vendor. Water charges and sewer rents, assessed by The City of New York, will be billed to the Residential Section as a Residential Common Expense. The costs and expenses of central heat and gas with respect to the Residential Section, will be included in Residential Common Charges: Unit Owners will be required to pay charges for electricity consumed for operation of the heat pumps for each Unit. Gas and water and sewer provided to the Commercial Units will be separately submetered. Schedule A sets forth estimates of the amounts of PILOT which will be payable with respect to each Residential Unit. See the Notes to Schedule A with respect to the bases of such estimates.

28

## CERTAIN DEFINITIONS

For convenience of presentation, definitions of certain of the terms used in the Declaration are set forth below:

"Administrative Fee" refers to the fee due Landlord to compensate it for its administrative expenses incurred in connection with the sale, assignment, lease, other transfer, mortgage or encumbrance of the interest in any Unit at anytime by Declarant or any Unit Owner (hereinafter each such transaction being a "Sale") as determined by Landlord from time to time. During the period ending on the fifth anniversary of the First Closing, the Administrative Fee per any Sale of a Unit will not exceed $250 during the first twelve (12) months of such period, $260 during the second twelve (12) months of such period, $270 during the third twelve (12) months of such period, $280 during the fourth twelve (12) months of such period, and $290 during the fifth twelve (12) months of such period. Notwithstanding the foregoing, to the extent that a law firm or title agent, licensed to do business in the State of New York, receives immediately available funds or a certified check drawn on a bank licensed to do business in the State of New York, in the amount of the Administrative Fee or any Proportionate Rent, Transaction Payment, or Flip Tax Payment then due with respect to the Unit, such law firm or title agent shall hold such funds in trust for Landlord for delivery promptly after the Sale.

"Base Rent Floor" refers to an amount per annum, determined as of the first day of each of the Second, Third and Fourth Periods, equal to the greater of: (a) six percent (6%) of the fair market value of the Land, determined in accordance with Sections 3.02(c) and 3.09 of the Lease, considered as unencumbered by the Lease and the Master Lease and as unimproved except for Landlord's Civic Facilities and other site improvements made by Landlord; or (b) the Base Rent payable in the Lease Year immediately prior to the period for which such Base Rent Floor was determined.

"Base Rent" and "Rent" shall have the meanings set forth in the Lease as summarized in the Section of the Plan entitled "Summary of the Lease" under the Subsection entitled "Base Rent and Rent," as same may be amended from time to time.

"Board" refers to either the Condominium Board, the Residential Board or the Commercial Board, and all such boards are collectively referred to as the "Boards."

"BPCA" refers to the Battery Park City Authority d/b/a Hugh L. Carey Battery Park City Authority and its successors and assigns.

"BPCA Requirements" shall mean those requirements and obligations imposed upon the Tenant set forth in the Lease, the Master Lease, the Master Development Plan and the Design Guidelines as same may be amended from time to time and such other requirements of BPCA as may be imposed upon the Property pursuant to the terms of the Lease, the Master Lease, the Master Development Plan and the Design Guidelines.

"Building" refers to the structure and improvements including above and below grade segments, known as One River Terrace, Battery Park City, New York 10282 in which the Units of the Condominium are located.

"By-Laws" refers to the By-Laws governing the operations of the Condominium, which are set forth as Exhibit D of the Declaration, as same may be amended, modified and/or supplemented from time to time and as permitted under the Lease.

"Café Unit" refers to the Café Unit as designated and described in the Declaration and the Floor Plans located in Part II of the Plan.

"Café Unit Owner" refers to the owner or owners of the Café Unit.

"Café Unit Proportionate Rent" refers to the sum of (i) the Café Unit's Commercial Common Interest multiplied by the Base Rent, (ii) the Civic Facilities Payment allocated to the Café Unit under the Lease, (iii) the PILOT payments attributable to the Café Unit under the Lease, (iv) the Café Unit Percentage Rent, (v) the Café Unit's Net Non-Residential Revenue, and (vi) the Default Costs attributable to the Café Unit under the Lease.

"City Register's Office" refers to the New York County office of the Register of The City of New York.

"Civic Facilities Payment" shall have the meaning set forth in the Lease as summarized in the Section of the Plan entitled "Summary of the Lease" under the Subsection entitled "Civic Facilities," as same may be amended from time to time.

"Commercial Board" refers to the board of managers designated by the Commercial Unit Owners in the manner set forth in the By-Laws.

"Commercial Common Charges" refers to assessments payable to the Commercial Board by the Commercial Unit Owners in accordance with the terms of the By-Laws, for the purpose of meeting (a) Commercial Common Expenses and (b) each Commercial Unit Owner's pro rata share of General Common Expenses.

"Commercial Common Expenses" refers to the costs and expenses incurred or projected in connection with the repair, maintenance, replacement, restoration and operation of, and any alteration, addition or improvement to, the Commercial Common Elements.

"Commercial Common Elements" refers to those Common Elements which serve or benefit exclusively the Commercial Units and/or the Commercial Unit Owners.

"Commercial Common Interest" refers to the proportionate undivided interest, expressed as a numerical percentage, in the Commercial Common Elements appertaining to each Commercial Unit determined in accordance with the Declaration. The Commercial Common Interest is the basis

16-17(1-4 Certain Definitions)

of determining a Commercial Unit Owner's liability for a share of the Commercial Common Expenses.

"Commercial Limited Common Elements" refers to those Common Elements which serve or benefit one or more but not all of the Commercial Units and/or the Commercial Unit Owners.

"Commercial Section" refers to the Commercial Units, the Commercial Common Elements and the Commercial Limited Common Elements.

"Commercial Unit" refers to either the Garage Unit or the Public Library Unit or the Poets House Unit or the World Hunger Education Center Unit or the Café Unit, and all such Commercial Units are collectively, referred to as the "Commercial Units."

"Commercial Unit Owners" refers to the owner or owners of the Commercial Units.

"Common Charges" refers to General Common Charges, Commercial Common Charges, and Residential Common Charges which are necessary to pay the Common Expenses.

"Common Elements" refers to the General Common Elements, the Residential Common Elements, the Residential Limited Common Elements, the Commercial Common Elements and the Commercial Limited Common Elements as more particularly described in the Declaration and Floor Plans.

"Common Expenses" refers to the General Common Expenses, the Residential Common Expenses, and the Commercial Common Expenses which together include, but are not limited to, the aggregate of the amounts required under the Lease and the By-Laws to be paid by the Unit Owners to the Condominium Board, or the Condominium Board and the Landlord, including Proportionate Rent payable with respect to all the Units. The Common Expenses include all other amounts needed to pay the expenses of operating the Condominium but not required to be paid under the Lease, as determined by the Condominium Board or as provided in the Declaration or By-Laws.

"Common Interest" refers to the proportionate undivided interest, expressed as a numerical percentage, in the General Common Elements appertaining to each Unit determined in accordance with the Declaration. The Common Interest is the basis of determining, among other things, a Unit Owner's (a) voting power, and (b) share of any distributions upon termination of the Condominium.

"Condominium" refers to Riverhouse One Rockefeller Park a/k/a Riverhouse on Rockefeller Park and One and Two River Terrace located at One and Two River Terrace, Battery Park City, New York, New York 10282.

"Condominium Act" refers to the New York Condominium Act, as amended from time to time, and presently found in the New York Real Property Law, Article 9B, or any statute in lieu thereof.

16-17(1-4 Certain Definitions)

"Condominium Board" refers to the overall board of managers of the Condominium comprised of representatives of the Residential Board and of the Commercial Board as set forth in the By-Laws.

"Condominium Covenants" refers to the terms, covenants and conditions that are required to be performed by Tenant under the Lease and the Condominium Documents. Condominium Covenants do not include the obligation of any Unit Owner to pay Proportionate Rent as provided hereunder or to complete the construction of the Building after the First Closing.

"Condominium Date" refers to the date of the First Closing.

"Condominium Documents" refers to the Condominium Plan, the Declaration, the By-Laws, the Unit Deed and the Unit Mortgage Subordination and Recognition Agreement, as amended, modified and/or supplemented from time to time and as permitted under the Lease.

"Condominium Default" refers to the failure of the Condominium Board, as Tenant under the Lease, to comply with or observe or perform any of the Condominium Covenants, or any of the following "events of default" by the Condominium Board:

(i)     to the extent permitted by Law, if Tenant shall admit, in writing, that it is unable to pay its debts as such become due;

(ii)    to the extent permitted by Law, if Tenant shall make an assignment for the benefit of creditors;

(iii)   to the extent permitted by Law, if Tenant shall file a voluntary petition under Title 11 of the United States Codes or if such petition is filed against it, and an order for relief is entered, or if Tenant shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, other present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Tenant, or of all or any substantial part of its properties or of the Property or any interest therein of Tenant, or if Tenant shall take any organizational action in furtherance of any action described in this subparagraph (iii) or described in subparagraphs (i) or (ii) above;

(iv)    to the extent permitted by Law, if within ninety (90) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within ninety (90) days after the appointment, without the consent or acquiescence of Tenant, of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Tenant or of all or any substantial part of its properties or of the Property or any interest therein of Tenant if such

16-17(1-4 Certain Definitions)

appointment shall not have been vacated or stayed on appeal or otherwise, or if, within thirty (30) days after the expiration of any such stay, such appointment shall not have been vacated;

    (v)    if Tenant shall abandon the Property;

    (vi)    if this Lease or the estate of Tenant hereunder shall be assigned, subleased, transferred, mortgaged or encumbered, or there shall be a Transfer, without Landlord's approval to the extent required hereunder or without compliance with the provisions of the Lease applicable thereto and such transaction shall not be made to comply or voided ab initio within thirty (30) days after notice thereof from Landlord to Tenant;

    (vii)    if a levy under execution or attachment shall be made against the Property and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within a period of thirty (30) days:

    (viii)    if Tenant is a corporation, limited partnership, limited liability company or other entity, if Tenant shall at any time fail to maintain its corporate, limited partnership, limited liability company or other entity existence in good standing, or to pay any corporate franchise or similar tax when and as the same shall become due and payable and such failure shall continue for thirty (30) days after notice thereof from Landlord or any governmental agency to Tenant; and

    (ix)    if Tenant shall breach one or more of the terms, conditions, covenants or agreements contained in Article 42 of the Lease.

"Declarant" refers to Site 16/17 Development LLC, a Delaware limited liability company authorized to do business in the State of New York, and its successors and assigns.

"Declarant and/or its designee(s)," "Declarant or a designee of Declarant" or similar term refers to Declarant, any of the partners of Declarant, any affiliate of Declarant, any affiliate of any of the general or limited partners of Declarant, any officer or shareholder of a corporate partner of Declarant, or any partner of a partnership which is a partner of Declarant or any party designated in writing as a designee. As used in this paragraph, an affiliate shall be deemed to be a person or an entity who or which owns more than 50% of the legal and beneficial interest of Declarant or of any partner, a person or an entity with respect to which either Declarant or any partner owns more than 50% of the legal and beneficial interest, or an entity as to which more than 50% of its legal and beneficial interest is owned by a person or an entity which owns more than 50% of the legal and beneficial interest of Declarant or of any partner.

"Declaration" refers to the instrument creating the Condominium, as the same may be amended, modified and/or supplemented from time to time and as permitted under the Lease.

"Default Costs" refers to any costs and expenses incurred by any Board or Landlord as the result of a Unit Owner Default, including, without limitation, any tax obligations and any costs or

expenses incurred in connection with any Legal Proceeding or otherwise in connection with the collection of Proportionate Rent (including, without limitation, reasonable attorneys fees and disbursements) together with interest thereon at the Involuntary Rate or any costs incurred in a subsequent disposition of a Unit acquired by any Board or Landlord.

"Depository" means a savings bank, a savings and loan association or a commercial bank or trust company ("Institutional Lender") which has executed and delivered a Depository Agreement and would qualify as an Institutional Lender, designated by the Condominium Board to serve as Depository pursuant to the Lease, provided all funds held by any Depository pursuant to the Lease shall be held in a segregated, non-commingled interest bearing account or instrument held in New York City.

"Depository Agreement" means an agreement, in form and substance reasonably acceptable to Landlord and the Condominium Board, pursuant to which the Depository agrees to perform its obligations under the Lease and the Offering Plan, as same may be amended from time to time.

"Design Guidelines" refers to the guidelines dated December, 2003 governing the design of the Building, as same may be amended, modified and/or supplemented from time to time and as permitted under the Lease.

"First Closing," or words of similar import, refers to the date a Residential Unit is first conveyed to a Purchaser pursuant to the Plan.

"Flip Tax Payment" refers to the payment in an amount equal to one percent (1%) of the Gross Sales Price of each Residential Unit due upon the transfer of such Residential Unit.

"Floor Plans" refers to the floor plans of the Building, as the same may be amended from time to time, which are approved by the Real Property Assessment Department of The City of New York and filed with the City Register's office.

"Garage Unit" refers to the Garage Unit as designated and described in the Declaration and the Floor Plans located in Part II of the Plan.

"Garage Unit Owner" refers to the owner or owners of the Garage Unit.

"Garage Unit Proportionate Rent" refers to the sum of (i) the Garage Unit's Commercial Common Interest multiplied by the Base Rent, (ii) the Civic Facilities Payment allocated to the Garage Unit under the Lease, (iii) the PILOT payments attributable to the Garage Unit under the Lease, (iv) the Garage Unit Percentage Rent, and (v) the Default Costs attributable to the Garage Unit under the Lease.

"General Common Charges" refers to assessments payable to the Condominium Board by the Residential Board and the Commercial Board for the purpose of meeting General Common Expenses.

16-17(1-4 Certain Definitions)

"General Common Elements" refers to the Land and all parts of the Building, including its foundations, roofs and supports, other than the Units, the Residential Common Elements, the Commercial Common Elements and the Limited Common Elements.

"General Common Expenses" refers to costs and expenses incurred or projected and attributable to the repair, maintenance, replacement, restoration and operation of, and any alteration, addition or improvement to, the General Common Elements and as otherwise provided in the Declaration and By-Laws.

"Governmental Authority" or "Governmental Authorities" refers to the United States of America, the State of New York, New York City, BPCA and any agency, department, commission, board, bureau, instrumentality or political subdivision of any of the foregoing, including any public or quasi-public authorities, now existing or hereafter created, having jurisdiction over the Property (hereinafter defined) or any portion thereof.

"Gross Sales Price" refers to all amounts received as consideration for the transfer of a Unit, including: (a) all cash or cash equivalent proceeds; (b) the outstanding principal amount of any debt, and any interest accrued thereon, assumed by the purchaser in such sale or to which such sale is made subject; (c) the fair market value of any property received by or on behalf of the Seller of a Unit (or with respect to the Flip Tax Payment the Condominium Board) as consideration; (d) the amount of any installments of the purchase price for such Unit payable subsequent to the closing of such sale, whether pursuant to a purchase money promissory note or otherwise; and (e) any other amounts received as consideration.

"Involuntary Rate" refers to the Prime Rate (hereinafter defined) plus two percent (2%) per annum, but in no event, in excess of the maximum permissible interest rate then in effect in the State of New York. The Prime Rate shall be the prime or base rate announced as such from time to time by Citibank, N.A., or its successors, at its principal office. Any interest payable under the Lease with reference to the Prime Rate shall be adjusted on a daily basis, based upon the Prime Rate in effect at the time in question, and shall be calculated on the basis of a 360-day year with twelve months of thirty (30) days each.

"Land" refers to the parcel of land described in Exhibit A to the Declaration.

"Landlord refers to Battery Park City Authority.

"Landlord's Condominium Costs" refers to all reasonable sums paid by Landlord and all reasonable costs and expenses incurred by Landlord, including without limitation, reasonable attorneys' fees and disbursements, in connection with its performance of any Condominium covenant or the cure of any Condominium Default, as well as any costs or expenses incurred in any such replacement of a Board in accordance with the terms of the Lease; including, without limitation, if a Board fails to provide insurance or to keep the same in force as required under the terms of the Lease, the amount of the insurance premium or premiums not paid, the uninsured amount of any loss, damage and liability and the reasonable costs and expenses of suit, including, without

limitation, reasonable attorneys' fees and disbursements, suffered or incurred by reason of such failure to provide insurance; and interest on the above amounts from the respective dates of Landlord's making of each such payment or incurring of each such sum, cost, expense, loss or damage until the date of actual repayment to Landlord (any such sum, cost, expense, loss or damage, together with interest on the above amounts at the Involuntary Rate as defined in the Lease). Landlord's Condominium Costs shall be deemed part of the Residential Proportionate Rent payable by one or more Residential Unit Owners to the extent that such costs are paid from the Residential Security Fund as the result of a Residential Unit Owner Default or a Condominium Default, as the case may be.

"Law or Laws" refers to laws and ordinances of any or all of the federal, state, city, county and borough governments and rules, regulations, orders and directives of any or all departments, subdivisions, bureaus, agencies or offices thereof; or of any other governmental, public or quasi-public authorities, having jurisdiction over the Property, the Land, the Building, and Unit or any portion of any of the foregoing, any requirements or conditions of any licenses, permits, approvals or certificates issued by any of the foregoing, the direction of any public officer pursuant to Law, and the requirements and conditions of any easement, covenant, restriction, condition or other encumbrance that is binding upon the Property or the applicable portion thereof

"Lease" refers to the Agreement of Lease dated as of March 31st, 2005, and effective December 29, 2005, between Declarant and BPCA for the lease of the Property and all amendments, modifications and supplements thereto.

"Limited Common Elements" refers to the Residential Limited Common Elements and the Commercial Limited Common Elements.

"Master Development Plan" refers to that certain plan which governs the development of the property subject to the Master Lease, which is incorporated in Exhibit C of the Master Lease as superseded and modified by the Large-Scale Commercial Development Plan (also annexed to the Master Lease) and amendments thereto dated as of November 9, 1992 and as of February 28, 1995, as the same may be further amended, modified or supplemented.

"Master Landlord" refers to BPCA or the landlord at the time in question under the Master Lease.

"Master Lease" refers to that certain Restated Amended Agreement of Lease between BPCA, as landlord, and BPCA, as tenant, for the project area known as Battery Park City having a term expiring June 18, 2069 and dated as of June 10, 1980, as amended by the (a) First Amendment to Restated Amended Lease, dated as of June 15, 1983, (b) Second Amendment to Restated Amended Lease, dated as of June 15, 1983, (c) Third Amendment to Restated Amended Lease, dated as of August 15, 1986 and (d) Fourth Amendment to Restated Amended Lease dated as of May 25, 1990.

16-17(1-4 Certain Definitions)

"Net Non-Residential Rent" refers to an amount equal to one hundred percent (100%) of the Net Non-Residential Revenue as defined in the Lease, collected by the Café Unit Owner during a calendar year.

"Percentage Rent" refers to an amount equal to ten percent (10%) of the Gross Non-Residential Revenue colleted by a Commercial Unit Owner during a calendar year.

"Plan" refers to the offering plan of the Declarant for the establishment of condominium ownership of Declarant's leasehold estate in the Property, as filed with the Department of Law, as the same may be amended from time to time in accordance therewith and as permitted under the Lease.

"Poets House Unit" refers to the Poets House Unit as designated and described in the Declaration and the Floor Plans located in Part II of the Plan.

"Poets House Unit Owner" refers to the owner or owners of the Poets House Unit.

"Poets House Unit Proportionate Rent" refers to the sum of (i) the Poets House Unit's Commercial Common Interest multiplied by the Base Rent, (ii) the Civic Facilities Payment allocated to the Poets House Unit under the Lease, (iii) the PILOT payments attributable to the Poets House Unit under the Lease, (iv) the Poets House Unit Percentage Rent, and (v) the Default Costs attributable to the Poets House Unit under the Lease.

"Property" refers to the Land, the Building and the appurtenances thereto.

"Proportionate Rent" refers to the Garage Unit's Proportionate Rent, Café Unit's Proportionate Rent, Poets House Unit's Proportionate Rent, Public Library Unit's Proportionate Rent and the World Hunger Education Center Unit's Proportionate Rent and/or the Residential Proportionate Rent.

"Public Library Unit" refers to the Public Library Unit as designated and described in the Declaration and the Floor Plans located in Part II of the Plan.

"Public Library Unit Owner" refers to the owner or owners of the Public Library Unit.

"Public Library Unit Proportionate Rent" refers to the sum of (i) the Public Library Unit's Commercial Common Interest multiplied by the Base Rent, (ii) the Civic Facilities Payment allocated to the Public Library Unit under the Lease, (iii) the PILOT payments attributable to the Public Library Unit under the Lease, (iv) the Public Library Unit Percentage Rent, and (v) the Default Costs attributable to the Public Library Unit under the Lease.

"Public Open Space" refers to the area, including, but not limited to, Tear Drop Park South, north of the portion of the Building located along Vesey Place, designated as such on the floor Plans.

16-17(1-4 Certain Definitions)

"Recognition Agreement" or "Unit Mortgage Subordination and Recognition Agreement" refers to the agreement to be entered into between BPCA, the Condominium Board, the Unit Owner and the holder of any mortgage secured by a Unit, as required by BPCA as same may be amended from time to time, and as set forth as Exhibit "F" to the Declaration.

"Recognized Residential Unit Mortgage" refers to a mortgage held by a Recognized Residential Unit Mortgagee.

"Recognized Residential Unit Mortgagee" refers to the holder of any mortgage who is bound by and having the benefit of the Unit Mortgage Subordination and Recognition Agreement entered into with BPCA as provided in the Lease.

"Rental" refers to all amounts required to be paid by Tenant pursuant to the Lease, including, without limitation, the Upfront Lease Payment, Base Rent, Percentage Rent, PILOT, Transaction Payments, Additional Transaction Payment, Flip Tax Payments, Impositions and Civic Facilities Payments and shall be payable in the same manner as Base Rent; provided, however, that after Sponsor shall submit its leasehold interest in the Premises to a condominium form of ownership, then, Sponsor's obligations with respect to: (i) Percentage Rent and Net Non-Residential Rent shall become the direct obligations solely of the Unit Owners of the respective Commercial Units; (ii) the Transaction Payments and the Additional Transaction Payment shall become the direct obligations solely of the Sponsor; and (iii) the Flip Tax Payments shall become the direct obligations solely of the Owner of the Residential Unit being sold.

"Residential Board" refers to the board of managers elected or designated by the Residential Unit Owners in the manner set forth in the By-Laws.

"Residential Common Charges" refers to assessments payable to the Residential Board by Residential Unit Owners in accordance with the terms of the By-Laws, for the purpose of meeting Residential Common Expenses and each Residential Unit Owner's pro rata share of General Common Charges.

"Residential Common Elements" refers to those Common Elements which serve or benefit exclusively the Residential Units and/or the Residential Unit Owners.

"Residential Common Expenses" refers to the costs and expenses incurred or projected in connection with the repair, maintenance, replacement, restoration, improvement, alteration and addition of and to the Residential Common Elements or the Residential Limited Common Elements (to the extent such costs and expenses are not the obligation of the Residential Unit Owners owning the Residential Units to which such Residential Limited Common Elements are appurtenant) or in connection with any services or facilities exclusively benefiting the Residential Section or the Residential Unit Owners or as otherwise provided in the Declaration or By-Laws.

"Residential Common Interest" refers to the proportionate undivided interest, expressed as a numerical percentage, in the Residential Common Elements appertaining to each Residential Unit

16-17(1-4 Certain Definitions)

determined in accordance with the Declaration. The Residential Common Interest is the basis of determining a Unit Owner's liability for a share of the Residential Common Expenses.

"Residential Limited Common Elements" refers to those Common Elements which serve or benefit exclusively one or more but not all the Residential Units and/or the Residential Unit Owners.

"Residential Rules and Regulations" refers to the rules and regulations made in accordance with the By-Laws and attached thereto as Schedule A.

"Residential Proportionate Rent" with respect to any Residential Unit refers to the sum of (i) the Residential Base Rent multiplied by the Residential Common Interest of such Residential Unit, (ii) the Civic Facilities Payment attributable to the Residential Section under the Lease multiplied by the Residential Common Interest of such Residential Unit, (iii) the PILOT under the Lease attributable to or assessed against such Residential Unit, and (iv) the Default Costs attributable to or assessed against such Residential Unit.

"Residential Section" refers to the Residential Units, the Residential Common Elements and the Residential Limited Common Elements.

"Residential Unit" refers to any Unit designated as a Residential Unit in the Declaration, and all such Residential Units are collectively, referred to as the "Residential Units."

"Residential Unit Owner" refers to any owner of a Residential Unit, and all such owners are, collectively, referred to as "Residential Unit Owners."

"Section" refers to the Residential Section or Commercial Section. Both of such Sections are collectively referred to as "Sections."

"Security Fund" or "Residential Security Fund" refers to the fund established in accordance with the terms of the Lease to be applied in the event of a default in the payment of Residential Proportionate Rent and to cure defaults in Condominium Covenants applicable to the Residential Section, as provided in the Lease.

"Terrace(s)" refers to terraces and/or balconies and/or roof gardens appurtenant to and made a part of certain Residential Units.

"Unit" or "Condominium Unit" refers to a space designated as a Residential Unit or a Commercial Unit in the Declaration, consisting, generally, of either a specific apartment or a portion of the commercial space in the Building, together with an appurtenant proportionate undivided interest in the General Common Elements, and as the case may be, in the Residential Common Elements, the Residential Limited Common Elements, the Commercial Common Elements or in the Commercial Limited Common Elements. All of such Units are collectively referred to as "Units."

"Unit Deed" refers to an instrument, in the form in the Plan, pursuant to which the Unit Owner's leasehold condominium interest in a Unit (as described in the Condominium Documents) is granted and transferred by Declarant, or a Unit Owner of such Unit after Declarant's transfer thereof, to a purchaser thereof, such transfer being subject to the rights of Landlord under the Lease, including, without limitation such rights as exist in the event of a Unit Owner Default.

"Unit Owner" refers to any Residential Unit Owner or any Commercial Unit Owner, and all of such Residential Unit Owners and Commercial Unit Owners are collectively referred to as the "Unit Owners."

"Unit Owner Default" or "Residential Unit Owner Default" refers to a failure of any Unit Owner to pay the Proportionate Rent attributable to such Unit in accordance with the terms of the Lease, Declaration, By-Laws and Unit Deed.

"Unsold Residential Unit" refers to any Residential Unit owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained, by Declarant or its designee; a Residential Unit that is acquired, individually or collectively, by a principal of Declarant or a group of which Declarant or one or more of the principals of any of them, is a member; or a Residential Unit that is acquired, individually or collectively, by either the holder of a Recognized Residential Unit Mortgage given by Declarant or the designee of a holder of such Recognized Residential Unit Mortgage.

"World Hunger Education Center Unit" refers to the World Hunger Education Center Unit as designated and described in the Declaration and the Floor Plans located in Part II of the Plan.

"World Hunger Education Center Unit Owner" refers to the owner or owners of the World Hunger Education Center Unit.

"World Hunger Education Center Unit Proportionate Rent" refers to the sum of (i) the World Hunger Education Center Unit's Commercial Common Interest multiplied by the Base Rent, (ii) the Civic Facilities Payment allocated to the World Hunger Education Center Unit under the Lease, (iii) the PILOT payments attributable to the World Hunger Education Center Unit under the Lease, (iv) the World Hunger Education Center Unit Percentage Rent, and (v) the Default Costs attributable to the World Hunger Education Center Unit under the Lease.

# BATTERY PARK CITY AUTHORITY AND THE PROJECT AREA

The Condominium is located in Battery Park City, a 92 acre site located at the west side of lower Manhattan in New York City (the "Project Area"). The Project Area is owned by Battery Park City Authority ("BPCA") which was created in May, 1968 by the Battery Park City Authority Act, Title 12 of Article 8 of the New York Public Authorities Law (Sections 1970 through 1988 as amended, the "BPCA Act"). Section 1973 of the BPCA Act declares BPCA to be "a body corporate and politic, constituting a public benefit corporation." BPCA's principal office is located at One World Financial Center, New York, New York 10281. BPCA was created for the purpose of financing, constructing and operating a planned community development in the Project Area. The Project Area is subject to the Restated Amended Agreement of Lease between BPCA, as landlord, and BPCA, as tenant, having a term expiring June 17, 2069 and dated as of June 10, 1980, as amended by the (a) First Amendment to Restated Amended Lease, dated as of June 15, 1983, (b) Second Amendment to Restated Amended Lease, dated as of June 15, 1983, (c) Third Amendment to Restated Amended Lease, dated as of August 15, 1986 and (d) Fourth Amendment to Restated Amended Lease dated as of May 25, 1990 (the "Master Lease"). A copy of the Master Lease is on file at the office of the Selling Agent for examination by prospective purchasers and their attorneys.

New York City, the original owner of the Project Area, leased the Project Area to BPCA in November, 1969, which lease, as amended, provided for the development of the Project Area by BPCA in accordance with the terms thereof, the Master Development Plan (which appeared as an exhibit to said lease) and the special zoning district for the Project Area established pursuant to the Zoning Resolution of the City of New York. On June 10, 1980, the New York State Urban Development Corporation ("UDC"), created in 1968 by the Urban Development Corporation Act (as amended, the "UDC Act"), in order to expedite development of the Project Area, exercised its power of eminent domain to acquire fee simple absolute title to the Project Area, subject to the aforementioned lease, as amended. UDC determined that certain local restrictions and regulations which impeded the development of the Project Area could best be overcome by ownership of the property by an entity with the powers of a state agency. UDC conveyed title to the Project Area to BPCDC, a wholly owned subsidiary of UDC, by deed dated June 10, 1980, subject to the aforementioned lease, as amended. The aforementioned lease, as amended, was further amended by BPCA and BPCDC and restated as the Master Lease. BPCDC conveyed fee simple absolute title to the Project Area to BPCA by deed dated December 28, 1982, subject to the Master Lease. Pursuant to the terms of said deed and the Master Lease, there was no merger of the fee estate in the Project Area and the leasehold estate created by the Master Lease by reason of the fact that BPCA became both the landlord and the tenant under the Master Lease.

In connection with the acquisition of the Project Area by UDC, New York City was granted the right to reacquire for one dollar all of UDC s, BPCDC's and BPCA's rights in the Project Area and all of the net assets of BPCA, once BPCA repays the indebtedness incurred in respect of the Project Area, but not prior to December 31, 1999. Alternatively, New York City can reacquire the Project Area at an earlier date, by providing funds sufficient to repay such indebtedness.