The Master Development Plan which governs the development of the Project Area, is incorporated in Exhibit C of the Master Lease. The Master Development Plan was superseded and modified by the Large-Scale Commercial Development Plan (also annexed to the Master Lease) and amendments thereto dated as of November 9, 1992 and as of February 28, 1995, as the same may be further amended, modified or supplemented (hereinafter collectively the "Master Development Plan").

The Master Development Plan provides for (i) no more than 14,100 apartments; (ii) a maximum of six million square feet of office space; (iii) other commercial facilities including retail and community shopping facilities, parking facilities, and service facilities; and (iv) municipal facilities to be provided by BPCA, including but not limited to sewers, water lines, hydrants, parks and plazas, a waterfront esplanade and other cultural and recreational facilities. New York City has agreed to accept for dedication all municipal facilities built in accordance with its requirements, except that with respect to certain municipal facilities, acceptance for dedication is conditioned upon BPCA obtaining prior consent of the City to the construction thereof pursuant to the terms of the Settlement Agreement.

After the municipal facilities are dedicated to New York City, it will be responsible for their operation and maintenance.

By reason of Section 1981 of the BPCA Act, the Project Area is exempt from real property taxes.

## SUMMARY OF THE LEASE

The principal provisions of the Lease are as follows:

### Landlord

The landlord under the Lease is Battery Park City Authority d/b/a Hugh L. Carey Battery Park City Authority, a body corporate and politic constituting a public benefit corporation of the State of New York having an office at One World Financial Center, New York, New York 10281 (the "Landlord"). The Landlord is not affiliated with Sponsor.

### Tenant

The Tenant under the Lease will initially be Sponsor. From and after the First Closing the Tenant under the Lease will be the Condominium Board, on behalf of all Unit Owners, which shall pay, perform and observe all of the terms, covenants and conditions of the Lease on the Tenant's part to be paid, performed and observed. However, see the subsection entitled "Condominium Operation: Defaults" which follows, for a discussion of the rights and remedies of the Landlord and the Boards in the event of the failure of any of the Boards to so pay, perform, or observe the terms of the Lease due to a Unit Owner's failure to pay, perform or observe any term, covenant or condition under the Lease, the By-Laws or the Declaration.

### Term

The term of the Lease will expire on June 17, 2069. The Lease does not provide for any renewal period. If the Condominium Board is unable to obtain, or if for any reason the fee owner or landlord under the Master Lease, as the case may be, refuses to grant an extension or new lease on favorable terms, the Unit Owners will be required at such time (but no sooner than June 17, 2069) to surrender possession of the Units and the Property. In such event, the ownership interest in the Unit will be terminated and Unit Owners may no longer have the right to possession of the Property or to remain in occupancy of their Units. Purchasers are advised that as the term of the Lease diminishes, the value of the leasehold condominium units diminishes. Accordingly, as the term of the Lease diminishes, it will become increasingly difficult to arrange for, or to refinance, a mortgage on a Unit. Furthermore, unless an extension or new lease is negotiated the prices of Units being resold toward the expiration of the Lease will likely be adversely affected because of the decreasing length of the term of the Lease. No representation is made or warranty given as to whether the Lease will be extended or renewed or as to the terms of any such extension or the right of Unit Owners to remain in occupancy thereafter.

### Base Rent and Rent

The Base Rent payable annually under the Lease shall be as follows:

(i)     For each of the first twenty-five (25) years of the term of the lease, the Base Rent shall be as follows:

| Lease Year | Base Rent |
|---|---|
| 1 | 1,100,000 |
| 2 | 1,155,000 |
| 3 | 1,212,750 |
| 4 | 1,273,388 |
| 5 | 1,337,057 |
| 6 | 1,403,910 |
| 7 | 1,474,105 |
| 8 | 1,547,810 |
| 9 | 1,625,201 |
| 10 | 1,706,461 |
| 11 | 1,791,784 |
| 12 | 1,881,383 |
| 13 | 1,975,442 |
| 14 | 2,074,214 |
| 15 | 2,177,925 |
| 16 | 2,286,821 |
| 17 | 2,401,162 |
| 18 | 2,521,220 |
| 19 | 2,647,281 |
| 20 | 2,779,645 |
| 21 | 2,918,627 |
| 22 | 3,064,559 |
| 23 | 3,217,787 |
| 24 | 3,378,676 |
| 25 | 3,547,610 |

(ii)    For each Lease Year commencing on the December 29, 2030 and continuing for a period of fifteen (15) Lease Years thereafter (the "Second Period"), an amount per annum equal to the Base Floor Rent determined as of December 29, 2030, as escalated in accordance with the next succeeding sentence. Base Rent for the Second Period shall escalate on December 29, 2035 and December 29, 2040 by the greater of: (x) fifteen percent (15%) of the Base Rent set for the prior five (5) Lease Years; or (y) the percentage of increase, if any, of the Consumer Price Index as determined for the month in which the applicable escalation date occurs over the Consumer Price Index for the first month of the prior five (5) Lease Year period (i.e., December, 2030 and December, 2035, respectively).

16-17(1-5 Battery Park City Authority and The Project Area)

(iii)     For each Lease Year commencing on December 29, 2045 and continuing for a period of fifteen (15) Lease Years thereafter (the "Third Period"), an amount per annum equal to the Base Floor Rent, determined as of the first day of the Third Period, as escalated in accordance with the next succeeding sentence. Base Rent for the Third Period shall escalate on December 29, 2050 and December 29, 2055 by the greater of: (x) fifteen percent (15%) of the Base Rent set for the prior five (5) Lease Years; or (y) the percentage of increase, if any, of the Consumer Price Index for the month in which the applicable escalation date occurs over the Consumer Price Index for the first month of the prior five (5) Lease Year period (i.e., December, 2045 and December, 2050, respectively).

(iv)     For each Lease Year commencing on December 29, 2060 and continuing thereafter until the Expiration Date (the "Fourth Period"), an amount per annum equal to the Base Rent Floor determined as of the first day of the Fourth Period, as escalated in accordance with the next succeeding sentence. Base Rent for the fourth Period shall escalate on December 29, 2065 by the greater of: (x) fifteen period (15%) of the Base Rent set for the prior five (5) Lease Years; or (y) the percentage of increase, if any, of the Consumer Price Index as determined for the month in which the applicable escalation date occurs over the Consumer Price Index for the first month of the prior five (5) Lease Year period (i.e., December, 2060 and December, 2065, respectively).

For the purposes of calculating the Base Rent Floor in connection with the calculation of Base Rent for the Second Period, Third Period and Fourth Period, the fair market value of the Land shall be determined as of December 29, 2030, December 29, 2045 and December 29, 2060, as the case may be. Such determination of fair market value shall be made by appraisal, unless at least twelve (12) months prior to the First Appraisal Date or any Reappraisal Date, Landlord and Tenant shall have agreed upon such fair market value.

The Lease is a "net lease," meaning that the Tenant is to pay all costs, expenses, charges and other obligations relative to the Property including but not limited to real property assessments (other than PILOT, as defined hereinafter), personal property taxes, occupancy and rent taxes, water, water meter and sewer rents, rates and charges, excises, levies, license and permit fees, service charges for municipal services, if any, fines, penalties, or other governmental charges.

Tenant may at its own cost and expense contest the amount or validity of any such item. However, payment of such item shall be postponed if, and only as long as the Property or any part thereof, or interest therein would not be in danger of being forfeited or lost, or subjected to any lien, encumbrance or charge and neither Landlord nor the Tenant would be subject to any civil or criminal liability; and there shall have been deposited, as provided in the Lease, cash or other security satisfactory to Landlord in the amount so contested and unpaid, together with all interest, penalties or charges which may be assessed in connection therewith.

The total rent due under the Lease (the "Rent") includes the Base Rent together with PILOT, Percentage Rent, Civic Facilities Payments, Impositions (all as more fully discussed below) and other sums due under the Lease and pursuant to the terms of the Plan is a Common Expense of the Condominium included in the Common Charges payable by Unit Owners. Prior to the First Closing,

Sponsor is required to make a one-time "Transaction Payment to BPCA" for each Unit conveyed as further consideration for the Lease. The Transaction Payment which is not due prior to the First Closing, shall be paid by Sponsor to BPCA upon the initial transfer of each Residential Unit in an amount equal to three percent (3%) of the Gross Sales Price of such residential Unit. Sponsor has agreed to secure its obligation to pay the Transaction Payment be depositing with BPCA a clear irrevocable letter of credit or directing the Law Firm of D'Agostino, Levine & Landesman, LLP, as Escrow Agent under the Purchase Agreements to pay to BPCA three percent (3%) of the Gross Sales Price from each Residential Unit Closing. Notwithstanding the foregoing, for as long as no Event of Default is existing under the Lease, in lieu of the Transaction Payments Letter of Credit, Tenant may secure its obligations under the Lease to pay the Transaction Payments by (i) including a provision, in form and substance reasonably acceptable to Landlord, in the Condominium Documents, the Purchase Agreement and the escrow agreement with the law firm or attorney(ies) (the "Escrow Agent") holding the down payment under each Qualified Purchase Agreement to the effect that upon the closing of the purchase of each Unit such Escrow Agent is authorized and directed, and agrees, to disburse an amount equal to three percent (3%) of the Gross Sales Price to Landlord by wire transfer of immediately available funds pursuant to wire transfer instructions to be furnished by Landlord, or by official bank check, or certified check, or attorney escrow check, drawn on or issued by a bank which is a member of the New York Clearing House Association, payable directly to the order of Landlord, and bearing no endorsements.

Additionally, in the event that the total of the Gross Sales Prices from the initial sale of the residential Units, divided by the aggregate amount of the square footage of all of such residential Units (the "Average Per Square Foot Gross Sales Price"), exceeds eight hundred seventy-five dollars ($875) per square foot, Tenant shall pay to Landlord on the date (the "Payment Date") that is the earlier to occur of: (i) the transfer of the last residential Unit to a bona fide purchaser; and (ii) the fourth anniversary of the transfer of the first residential Unit to a bona fide purchaser, an amount (the "Additional Transaction Payment") equal to twenty percent (20%) of an amount equal to the product of: (x) the amount by which the Average Per Square Foot Gross Sales Price exceeds eight hundred fifty dollars ($850) per square foot; and (y) the aggregate square footage of all of the residential Units. If, on the fourth anniversary of the transfer of the first residential Unit to a bona fide purchaser, there remain any unsold residential Units, the Average Per Square Foot Gross Sales Price of all residential Units theretofore transferred to bona fide purchasers or then under contract to bona fide purchasers shall be utilized to determine the Additional Transaction Payment (but the Additional Transaction Payment shall be calculated as if all of the residential Units had theretofore been sold to bona fide purchasers). Sponsor has guaranteed to BPCA the payment of the Additional Transaction Payment.

The Condominium Board shall also pay to BPCA, upon the transfer of each Residential Unit after the initial transfer of such Unit, an amount ("Flip Tax Payment") equal to one percent (1%) of the Gross Sales Price of such Unit.

The effectiveness of a transfer of a Unit is conditioned upon the making by Sponsor or the Condominium Board as successor Tenant, of a Transaction Payment, a Flip Tax Payment, or, if then payable, the Additional Transaction Payment Escrow Amount into escrow.

16-17(1-5 Battery Park City Authority and The Project Area)

## Percentage Rent On Non-Residential Revenue

During the Term of the Lease, the Unit Owner of two of the Non-Residential Units of the Condominium including the Unit Owners of the Garage Unit and Café Unit, Sponsor or Sponsor affiliate for so long as it owns a Non-Residential Unit, shall be obligated to pay Percentage Rent on Gross Non-Residential Revenue on a quarterly basis with respect to any such space in accordance with Sections 3.06 and 3.07 of the Lease. In addition, the Unit Owner of the Café Unit shall pay Net-Non-Residential Rent directly to the BPCA. The failure of a Commercial Unit Owner, or the Sponsor or its affiliate for so long as it owns a Commercial Unit, to pay Percentage Rent on Non-Residential Revenue will entitle Landlord to bring an action for payment against each such Unit Owner and pursue any rights granted to Landlord under the Lease, at law or in equity directly against each such Unit Owner and not against the Condominium Board (except as otherwise set forth in the Lease with respect to a Condominium default).

### Payments in Lieu of Taxes ("PILOT")

For each fiscal tax year of the City of New York or part thereof during the term of the Lease as set forth in further detail in the Footnotes to Schedule A, "Payments in Lieu of Taxes ("PILOT")" section and the "Opinion of Counsel", all located in Part I of the Plan, payments in lieu of taxes ("PILOT") shall be payable to Landlord with respect to the Residential Units in an amount equal to the greater of (i) real property taxes assessed and levied against the Residential Units or any part thereof pursuant to the provisions of Chapter 58 of the Charter of New York City and Chapter 2, Title 11 of the Administrative Code of the City of New York, as the same may now or hereafter be amended, or any statute or ordinance in lieu thereof (the "Tax Law") which would otherwise be payable if the Property or any part thereof or the owner thereof were not exempt therefrom, without exemption or abatement, or (ii) the minimum PILOT, as follows:

| Tax Year | Base Rent |
|----------|-----------|
| 1 | 4,279,066 |
| 2 | 4,407,438 |
| 3 | 4,539,661 |
| 4 | 4,675,851 |
| 5 | 4,816,126 |
| 6 | 4,960,610 |
| 7 | 5,109,429 |
| 8 | 5,262,711 |
| 9 | 5,420,593 |
| 10 | 5,583,211 |
| 11 | 5,750,707 |
| 12 | 5,923,228 |
| 13 | 6,100,925 |
| 14 | 6,283,953 |

| 15 | 6,472,471 |
| 16 | 6,666,645 |
| 17 | 6,866,645 |
| 18 | 7,072,644 |
| 19 | 7,284,823 |
| 20 | 7,503,368 |
| 21 | 7,728,469 |
| 22 | 7,960,323 |
| 23 | 8,199,133 |
| 24 | 8,445,107 |
| 25 | 8,698,460 |

PILOT is payable in equal semi-annual installments during each Tax Year in advance on the first day of each January and July. Prior to the Units being separately assessed under the Tax Law, the total assessed value of the Property attributable to the Residential Portion for the period prior to the first City assessment for the Residential Units will be the 100% of the total assessment for the Property.

PILOT constitutes a portion of the Rent due under the Lease.

### Civic Facilities

As described below, certain improvements (the "Landlord's Civic Facilities") have been or are to be made by Landlord to or adjacent to the Property. Tenant is obligated to pay an annual sum in equal monthly installments representing its allocable share of the cost of operating, maintaining, repairing, restoring, replacing and upgrading Governor Nelson A. Rockefeller Park, the Vesey Street turnaround area, a landscaped triangle on Murray Street, a landscaped median strip on North End Avenue ("Median Parks"), Teardrop Park, The Irish Hunger Memorial, Robert F. Wagner, Jr. Park, Rector Park, the Site 23/24 Ballfields and the Site 16/17 Public Open Space which is identified in the Design Guidelines for the Project (collectively, the "Parks") located within the pierhead line of the Project Area (as such terms are hereinafter defined), the curbs, street trees, insuring the Civic Facilities and maintaining a reserve fund (such costs are collectively referred to as the "Civic Facilities Payments") for each Lease Year. Upon completion, the permanent sidewalks shall be dedicated to the City of New York.

The Civic Facilities Payment ("CFP") shall be paid as follows:

(i)     First CFP Period: Commencing with the date on which a temporary Certificate of Occupancy ("TCO") is issued for any dwelling unit in the Building and ending on the last day of the Lease Year in which such TCO is received, an amount equal to the product obtained by multiplying an amount equal to: (A) the product obtained by multiplying the number of residential units in the Building by five hundred dollars ($500.00); and (B) the product derived by multiplying $.50 by the gross square feet of nonresidential floor area

16-17(1-5 Battery Park City Authority and The Project Area)

(other than lobbies, corridors, common storage areas, Resident Manager's Unit, utility and machinery rooms, laundry rooms and other space for the exclusive use of residents of the Building) ("Excluded Space") in the Building by (C) a fraction the numerator of which shall be the number of days between the Initial Occupancy Date and the last day of the Lease Year in which the Initial Occupancy Date occurs and the denominator of which shall be three hundred sixty-five (365);

(ii)     Second CFP Period: For each of the next two Lease Years succeeding the First CFP Period an amount equal to: (A) the product obtained by multiplying the number of residential units in the Buildings by five hundred dollars ($500.00); and (B) the product derived by multiplying $.50 by the gross square feet of nonresidential floor area in the Building other than the Excluded Space;

(iii)     Third CFP Period: For each of the next three Lease Years succeeding the Second CFP Period, an amount equal to: (A) the product obtained by multiplying the number of residential units in the Buildings by five hundred and fifty dollars ($550.00); and (B) the product derived by multiplying $.55 by the gross square feet of nonresidential floor area other than the Excluded Space;

(iv)     Fourth CFP Period: For each Lease Year succeeding the Third CFP Period, an amount equal to one hundred ten percent (110%) of the product of: (A) the "Parks Budget" multiplied by (B) a fraction, the numerator of which shall be the maximum permissible number of Zoning Floor Area in the Building, and the denominator of which shall be the then maximum permissible Zoning Floor Area in all residential buildings, including the Building, constructed or to be constructed in the Project Area in accordance with the Zoning Resolution of the City of New York, as such number may have been reduced by the Design Guidelines pertaining to such buildings); less amounts: (x) payable toward the Parks Budget by other tenants of BPCA in the Project Area under leases which were originally entered into prior to the Commencement Date; and (y) computed on the basis of operating costs for a particular neighborhood within the Project Area rather than for Operating Costs for the entire Project Area; provided that BPCA, at its sole option and at any time, may establish such alternative method of determining Tenant's allocable share of the Operating Costs and the amount of the Civic Facilities Payment as may be equitable with respect to all tenants of BPCA within the Project Area.

Notwithstanding the foregoing, the amount of Tenant's Civil Facilities payment for any Lease Year referred to therein shall not be greater than one hundred twenty-five percent (125%) of Tenant's Civic Facilities Payment for the prior Lease Year and the amount of capital costs included in the Operating Costs shall not exceed en percent (10%) of the Operating Costs for any one year.

Subject to the limitations on Civic Facilities Payments set forth above, for each Lease Year commencing with the Fourth CFP Period, Landlord shall give Tenant an estimate for such Lease Year of the Operating Costs incurred by Landlord. Within ten (10) days after such statement Tenant shall pay the amount by which its allocable share exceeds the Civic Facilities Payment made during

such Lease Year, or, if the payment exceeds its share, Tenant has the right to offset the excess against the next installment.

Civic Facilities Payments constitute a portion of the Rent due under the Lease.

## Impositions

Tenant is required to pay all of the following items (collectively, "Impositions") imposed by any Governmental Authority (other than a Governmental Authority acting in its capacity as Landlord and not in its governmental capacity): (1) real property assessments (not including PILOT), and (2) encumbrances or liens (not resulting from work performed by, or on behalf of, Landlord on: (i) personal property taxes, (ii) occupancy and rent taxes, (iii) water, water meter and sewer rents, rates and charges, (iv) excises, (v) levies, (vi) license and permit fees, (vii) service charges with respect to police protection, fire protection, street and highway construction, maintenance and lighting, sanitation and water supply, if any, (viii) fines, penalties and other similar or like governmental charges applicable to the foregoing and any interest or costs with respect thereto, and (ix) except for PILOT, any and all other governmental levies, fees, rents, assessments or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, which at any time during the term of the Lease are, or, if the Property or any part thereof or the owner thereof were not exempt therefrom, would have been (A) assessed, levied, confirmed, imposed upon or would have become due and payable out of or in respect of, or would have been charged with respect to, the Property or any document to which Tenant is a party creating or transferring an interest or estate in the Property (excluding any transfer taxes (unless required by statute to be paid by the grantee or transferee where the grantor or transferor is exempt therefrom) or capital gains taxes imposed in connection with the execution of the Lease), or the use and occupancy thereof by Tenant, and (B) encumbrances or liens on (i) the Property, or (ii) the sidewalks or streets in front of or adjoining the Property, or (iii) any vault (other than a vault in respect of which a utility company is obligated to pay any charge specified above or which is exempt from any such charge by reason of use thereof by any such utility company), passageway or space in, over or under such sidewalk or street, or (iv) any other appurtenances of the Property, or (v) any personal property (except personal property which is not owned by or leased to Tenant and except as otherwise specifically provided herein), equipment or other facility used in the operation thereof, or (vi) except as otherwise specifically provided herein, the Rent (or any portion thereof) payable by Tenant hereunder. For further details to Impositions see Footnotes to Schedule B in Part I of the Plan.

## Use

Tenant has the right to occupy the Building in accordance with the Certificate of Occupancy, the Master Development Plan and the Design Guidelines and for no other use or purpose, subject to the provisions of Law and of the Lease. Under the terms of the Lease, the Master Development Plan and the Design Guidelines, the First Floor uses of the Building are required to include a residential lobby and the Café Unit, the World Hunger Education Center Unit and the Library Unit. In addition, under the terms of the Lease, the Café Unit, the World Hunger Education Center Unit

and the Poets House Unit shall be open to the public. The Commercial Unit may be used for any lawful purposes, including, without limitation, use as a community center, eating and drinking establishments, retail stores and outlets, storage, theaters, banks, restaurants and commercial and professional offices and studios. No portion of the Building shall be used for office space (other than as an accessory to residential uses) without the written consent of the Landlord, which consent may be withheld in its sole discretion.

### Insurance

Tenant shall maintain the following insurance coverage:

    (i)    "All Risk of Physical Loss" casualty insurance.

    (a)    Amount - On an "agreed amount" basis, with the full replacement cost (having sublimits of $5,000,000 for flood insurance and $500,000 for earthquake coverage), with full replacement value of the Building to be determined from time to time, but not less frequently than required by the insurer and in any event at least annually.

    (ii)    Commercial General Liability Insurance.

    (a)    Amount - Such as may from time to time be reasonably required by Landlord but not less than Twenty-Five Million Dollars ($25,000,000) combined single limit.

    (b)    Special Coverage - broad form liability endorsement, products and completed operations, independent contractors, blanket automatic contractual liability to include bodily injury to employees of others assumed by Tenant, water damage legal liability, sprinkler leakage legal liability, elevators and escalators liability, safe deposit legal liability.

    (iii)    Worker's Compensation Insurance for all persons employed by Tenant at or in connection with the Property.

    (iv)    Rent Insurance Amount - on an "agreed amount" basis but not less than one year's current Base Rent, PILOT, Percentage Rent and Civic Facilities Payment.

    (v)    Boiler and Machinery Insurance.

    (a)    Amount - not less than $10,000,000 per accident on a combined basis.

    (b)    Special Coverage - direct property loss and loss of income, covering all steam, mechanical and electrical equipment.

    (vi)    Automobile Liability Insurance for all owned, non-owned and hired vehicles Amount - not less than $5,000,000 combined single limit.

(vii)     Other insurance reasonably required by the Landlord.

All required insurance (except Worker's Compensation) shall name Landlord and the landlord under the Master Lease as additional insureds, and as to items (i), (v), (vi) and (vii) each Recognized Unit Mortgagee shall be named as an insured.

The loss under all policies shall be paid to a Depository, as defined in the Lease, except that amounts less than $1,000,000 shall be paid in trust to the Condominium Board to apply to the cost of restoration. Such amount shall be adjusted on the fifth anniversary of the Commencement Date of the Lease and on each fifth anniversary of the date on which an adjustment is made by adding to $1,000,000 an amount equal to the product of $1,000,000 and the percent increase, if any, in the Consumer Price Index ("CPI") for the month in which the applicable anniversary date occurs over the CPI for the month in which the Commencement Date occurs.

The Condominium Board shall not carry separate insurance for the Condominium (other than for personal injury liability) unless Landlord and Master Landlord are included as additional insureds as their interests may appear. The coverage provided by Tenant also may name each Mortgagee as an additional insured provided that such Mortgagee irrevocably agrees in writing for the benefit of Landlord that all proceeds of such insurance shall be applied in accordance with the terms of the Lease.

All policies shall provide that adjustments for claims in excess of $1,000,000 shall be made with Landlord, the Condominium Board, and any Mortgagee named as loss payee, as its interest may appear. Any adjustments for claims less than $1,000,000 shall be made with the Condominium Board. Landlord has the right to require the Condominium to escrow for insurance premiums in an event of default under the Lease.

### Repairs and Maintenance

Tenant is obligated to take good care of and keep the Property in good order. Tenant is obligated to put, keep and maintain the Building in good and safe order and condition and make all repairs, all necessary replacements, renewals, alterations, and additions, interior and exterior, extraordinary and ordinary structural and non-structural, foreseen and unforeseen, necessary or appropriate to keep the Building in good and safe order and condition, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise. Tenant may not commit or suffer, and shall use all reasonable precaution to prevent, waste, damage or injury to the Property.

### Compliance with Laws, Requirements of Insurance Underwriters and Master Lease

Tenant is obligated to promptly comply with all Laws and the BPCA Requirements as to maintenance and operation of the Property. Tenant is obligated under the Lease to maintain the Property in good condition and repair, including without limitation, the Building, roofs, foundations and appurtenances thereto and all sidewalks adjacent to the Property. Tenant has the right at its sole cost and expense to contest the validity and application of such Laws, provided however, that Tenant

is obligated to post a bond or other security acceptable to Landlord securing compliance with the contested laws and the BPCA Requirements and payment of all interest, penalties, fines, fees and expenses in connection therewith.

## Changes, Alterations and Additions

Tenant may not demolish, replace or materially alter the Building, or make any addition thereto, unless Tenant shall furnish Landlord with a complete set of plans and specifications for such work and obtain Landlord's consent thereto and obtain the necessary permits from Governmental Authorities; and provided further that (i) such improvements shall not reduce the value of the Property below its value immediately prior to commencement of construction of such improvements, (ii) such improvements shall be made with reasonable diligence and shall be made in a good and workmanlike manner in accordance with Law and the BPCA Requirements, and (iii) Tenant shall deliver insurance policies as required under the Lease. Tenant may not make any such improvement to the Building, the estimated cost of which shall exceed $500,000 individually or in the aggregate (subject to CPI increases) or which involves structural work or affects the exterior of the Building or the height, bulk or setback of the Building, without (in addition to complying with the foregoing) paying to Landlord the reasonable fees and expenses of an independent architect or engineer selected by Landlord to review the plans and specifications and inspect the work, and prior to commencement, furnishing to Landlord complete plans and specifications prepared by an architect or engineer whose qualifications meet with the approval of Landlord, a copy of a contract satisfactory and assignable to Landlord with a reputable and responsible contractor containing the provisions set forth in the Lease, an assignment to Landlord of said contract and the security thereunder, and a payment and a performance bond or other security satisfactory to Landlord.

Unit Owners who perform demolition, replacement or alterations to their Units must comply with the foregoing requirements as well as the provisions of the Declaration and By-Laws.

## Damage or Destruction

If the Building is destroyed or damaged in whole or in part, such fact shall not relieve Tenant from its obligations under the Lease, including but not limited to the payment of Rent and other sums or charges without abatement of any kind.

If the Building shall be damaged or destroyed, Tenant shall give prompt notice thereof to Landlord (except no notice shall be required if the estimated cost of restoration is less than $500,000 or as such amount may be increased from time to time in accordance with the provisions of the Lease) and Tenant shall repair, alter, restore, replace and rebuild the Building at Tenant's cost and expense whether or not insurance proceeds, if any, are sufficient for such restoration and commence same with reasonable diligence. The insurance proceeds shall be paid out to Tenant by the Depository, as provided in the Lease. If the cost of restoration equals or exceeds $1,000,000, Tenant must provide Landlord with complete plans and specifications for the Restoration, prepared by a licensed professional engineer or registered architect selected by Tenant and approved by Landlord

16-17(1-5 Battery Park City Authority and The Project Area)

and a contract or management agreement approved by Landlord with payment and performance bonds, all as more particularly described in the Lease.

## Obligations with Respect to Construction and Maintenance of Civic Facilities

Landlord is obligated to construct or install electrical, gas and telephone mains; water mains; sanitary and storm sewers; fire hydrant and Emergency Response Service conduits and boxes; street lighting (conduit, cable, poles, fixtures and connections); streets and curbs. In addition, Landlord is obligated to construct or install parks and recreation areas, including, without limitation, those areas known as Governor Nelson A. Rockefeller Park, the Vesey Street turnaround area, a landscaped triangle on Murray Street, a landscaped median strip on North End Avenue, Teardrop Park, the Irish Hunger Memorial, Robert F. Wagner Jr. Park, Rector Park, the Site 23/24 Ballfields and the Site 16/17 Public Open Space, and a landscaped esplanade located within the pierhead line of the Project Area for public use (the foregoing facilities hereinafter referred to as the "Landlord's Civic Facilities"). Except for the installation of street trees, the landscaped esplanade has been completed.

The Lease provides that Tenant has certain obligations ("Tenant's Civic Facilities") in connection with the installation, maintenance and repair of the Civic Facilities. Those obligations include: (i) the installation of permanent sidewalks, including cobble strip, on streets adjacent to the Premises, including replacement curbs as required and both permanent street lighting (conduit, boxes, cable, poles, fixtures and connections) and any construction period lighting which may be required; and (ii) approximately twenty-two street trees of species determined by Landlord, each with a four and one-half to five inch caliper. All aspects of the furnishing and installation of such cobble strip and street trees shall be pursuant to drawings and specifications as provided by Landlord.

The Lease further provides that Tenant shall be obligated to maintain and replace the aforementioned trees until the first anniversary of the proper installation of such trees, after which date Landlord shall be responsible for such maintenance obligations. Further, the Lease contemplates that after completion of construction of the sidewalks, curbs and lighting, the maintenance obligations for same shall be performed by New York City.

Landlord shall maintain the Landlord Civic Facilities. Notwithstanding the foregoing, at such time as the electrical, gas and telephone mains are completed, the maintenance thereof shall be the responsibility of the utility company responsible therefor and the maintenance of the water mains, sanitary and storm sewers, fire hydrant and Emergency Response Service conduits and boxes; street lighting (conduit, cable, poles, fixtures and connections). Upon completion, the streets, sidewalks and curbs shall be the responsibility of the City of New York. Tenant shall maintain the Tenant's Civic Facilities and make all repairs, including structural repairs; provided however, the responsibility to maintain the street trees shall be that of Landlord from and after the first anniversary of the proper installation of said trees. The cost of maintaining, operating and repairing the Tenant's Civic Facilities shall be borne by all Unit Owners as a General Common Expense.

Each party shall insure those Civic Facilities it maintains against:

16-17(1-5 Battery Park City Authority and The Project Area)

(i)     damage by fire, water and flood in an amount not less than 100% of replacement value; and

(ii)     damage by other hazards in customary amounts, and Landlord shall maintain comprehensive general public liability insurance naming Tenant as additional insured.

Tenant's remedy for Landlord's failure to perform Maintenance Obligations (i.e., dirt, rubbish, snow and ice removal and repairs and replacements to keep the Civic Facilities in first-class condition) is the right to engage in self-help and receive the offset against Civic Facilities Payments. Tenant is not entitled to any such remedies if a default exists with respect to Tenant's payment of the Civic Facilities Payment.

Tenant may undertake Landlord's Construction or Maintenance Obligations if (subject to unavoidable delays) Landlord fails to do so and if Landlord has not remedied such failure within thirty (30) days of Tenant's notice of its intention to engage in self-help (or has not commenced a remedy within thirty (30) days of Tenant's notice if such failure is of a nature that cannot be remedied within thirty (30) days). Landlord, upon notice, will permit Tenant to inspect the Civic Facilities to determine Landlord's compliance with its obligations. Landlord grants Tenant the right to enter to perform self-help. Tenant has the right to offset against the next installment(s) of Civic Facilities Payments the amount of expenses incurred by engaging in self-help, plus interest, after giving Landlord a written statement thereof.

Landlord may transfer to a trust or other entity the responsibility of performing Landlord's Maintenance Obligations. Prior to such a transfer, Landlord must give Tenant assurances of the transferee's ability to perform Landlord's Maintenance Obligations, and must consult with Tenant as to the composition of such trust.

## Condominium Operation; Defaults

Each Residential Unit Owner shall appoint the Condominium Board and the Residential Board as such Unit Owner's attorney-in-fact for the purposes of paying, performing and observing all of the terms, covenants and conditions of the Lease on the part of the tenant thereunder to be paid, performed and observed.

### a.     Condominium Defaults

Each Board is liable to Landlord for any failure of such Board to comply with the those obligations under the Lease which are the obligation of such Board (the "Condominium Covenants"); provided, however, that no member of any Board shall have any personal liability as the result of a default by such Board in the performance of any such Condominium Covenant. The failure of any Board to perform or observe any of the Condominium Covenants which are the obligation of such Board is herein referred to as a "Condominium Default." It is not a Condominium Default under the Lease if the Condominium Board fails to pay Rent due under the Lease if caused by a Unit Owner's failure to pay Proportionate Rent provided that within ten (10) Business Days

after a Unit Owner's default the Condominium Board gives a notice of Default to said defaulting Unit Owner with a copy of the notice of Default to the Landlord. Under the terms of the Lease the Condominium Board is to hold the Proportionate Rent received from each Unit Owner for the benefit of, and in trust for, the benefit of Landlord and, at the request of Landlord, to segregate such funds. The first funds received as Common Charges or otherwise from a Unit Owner shall be applied to that Unit Owner's Proportionate Rent obligations. A failure of a Commercial Unit Owner to pay Commercial Proportionate Rent will not result in a default under the Lease as relates to any other Unit Owner.

In the event of a Condominium Default, the following provisions apply:

(i)     Landlord shall give notice to the Boards, all Unit Owners (Residential and Non-Residential) and Recognized Unit Mortgagees specifying the nature of the Condominium Default.

(ii)     Any Board, any Unit Owner(s) or any Recognized Unit Mortgagee(s) may, within forty-five (45) days after Landlord has given such notice, cause such Condominium Default to be remedied; provided that if curing of such Condominium Default requires the imposition of an assessment or special meeting of Unit Owners for such purpose and/or special meeting of Unit Owners in order to replace the members of any Board or work to be performed, acts to be done or conditions to be removed (collectively, "Unit Owner Action"), which cannot by their nature reasonably be imposed, conducted, performed, done, removed or completed, as the case may be, within such forty-five (45) day period, any Board, any Unit Owner(s) or any Recognized Unit Mortgagee(s) may cause such Unit Owner Action to be commenced within such forty-five (45) day period and shall thereafter may cause such Unit Owner Action to be prosecuted diligently, continuously and in good faith to completion and cause the Condominium Default promptly thereafter to be remedied. If Unit Owner Action is required to remedy a Condominium Default, the Unit Owners shall notify Landlord thereof and shall keep Landlord fully and currently informed of the status of such Unit Owner Action, the nature and timing of such Unit Owner Action and each step, act or thing done in connection therewith, together with the anticipated completion date of such Unit Owner Action.

(iii)     If a Condominium Default is not remedied as described above, Landlord will be permitted to replace the members of any Board responsible for failing to remedy such Condominium Default, by exercising its right under the collateral resignation to be signed by each member of each Board as a condition to such member serving on such Board. In furtherance thereof Landlord will be permitted, but not obligated, to designate new members to replace the members of any Board removed as aforesaid and to perform or cause compliance with the Condominium Covenant that gave rise to such Condominium Default. The Condominium Board, with respect to a Condominium Default for which the Condominium Board is responsible, the Residential Board, with respect to a Condominium Default for which the Residential Board is responsible or the Commercial Board, with respect to a Condominium Default for which the Commercial Board is responsible, is obligated to pay to Landlord, within twenty (20) days after demand therefor is delivered to such Board all reasonable sums incurred by Landlord. In the event of any breach or

16-17(1-5 Battery Park City Authority and The Project Area)

56

threatened breach of a Condominium Covenant by any Board, Landlord is entitled to enjoin such breach or threatened breach and is entitled to invoke any other rights and remedies allowed at law or in equity or by statute or otherwise.

(iv) In the event of a Condominium Default caused by failure of the Condominium Board to pay to the Landlord Proportionate Rent attributable to the Residential Units, provided (i) same is not the result of a Unit Owner Default, (ii) that the amount of cash in the Security Fund is less than one-half of the Maximum Fund Requirement or the Security Fund Amount (whichever is applicable) plus an amount of interest calculated at the rate of 3% per annum from the Condominium Date; and (iii) Landlord has given all notice periods provided hereunder and all such grace and cure periods have expired, then, Landlord shall be entitled to invoke any other rights and remedies allowed at law or equity, including without limitation, the right to terminate the Lease in accordance with the terms of the Lease.

## b. Residential Unit Owner Defaults

In the event of a Residential Unit Owner Default (as hereinafter defined) the following applies:

(i) Upon the failure of any Residential Unit Owner to pay Residential Proportionate Rent as required under the Lease and the applicable Unit Deed (hereinafter referred to as a "Residential Unit Owner Default" and any Residential Unit Owner engaged in a Residential Unit Owner Default is hereinafter referred to as a "Defaulting Residential Unit Owner"), subject to the rights, if any, of Recognized Unit Mortgagees to receive any notice of and to cure the Unit Owner Default to which such rights apply, the Condominium Board shall serve a written twenty (20) day notice upon the Defaulting Unit Owner specifying the amount of the Residential Proportionate Rent then due and unpaid (the "Default Notice"). Simultaneously with the giving of the Default Notice to the Defaulting Unit Owner, the Condominium Board shall deliver a copy of the Default Notice to Landlord and to all Recognized Unit Mortgagees entitled to cure the Residential Unit Owner Default. Notwithstanding anything to the contrary set forth above, in the event the Condominium Board fails to send the Default Notice as aforesaid, such notice may be sent by Landlord.

(ii) Each Recognized Unit Mortgagee shall be entitled to pay to the Condominium Board amounts owned by the Defaulting Residential Unit Owner. Provided such Residential Unit Owner Default shall be so remedied, Landlord shall not take any action against the Defaulting Residential Unit Owner and the Recognized Unit Mortgagee shall, in accordance with the terms of its Recognized Unit Mortgage, have the right to institute and thereafter prosecute foreclosure proceedings and such other proceedings as may then be available at law or in equity. In the event such Recognized Unit Mortgagee shall have failed to so remedy such Unit Owner Default as hereinabove provided, the Condominium Board or Landlord, as the case may be, may commence any action against such Defaulting Unit Owner without any further notice to such Recognized Unit Mortgagee. If, with respect to any Unit, there is more than one Recognized Unit Mortgagee, Landlord shall recognize the Recognized Unit Mortgagee whose Recognized Unit Mortgage is senior in lien as the Recognized Unit Mortgagee entitled to the rights afforded as describe above.

(iii)    Landlord shall accept performance by a Recognized Unit Mortgagee on the Condominium Board of any covenant, condition or agreement on a Residential Unit Owner's part to be performed with the same force and effect as though performed by such Residential Unit Owner.

(iv)    No earlier than twenty (20) business days and no later than ninety (90) calendar days after a Default Notice is given and provided that neither the Defaulting Residential Unit Owner, nor the Recognized Unit Mortgagee nor any other party has cured said Residential Unit Owner Default, the Condominium Board shall institute appropriate proceedings to foreclose the lien on such Residential Unit arising from said Residential Unit Owner Default as provided in Section 339-z of the Condominium Act, in the manner provided in Section 339-aa thereof or in any other manner permitted by Law. At any time not earlier than twenty (20) calendar days after a Default Notice is given, legal proceedings may be maintained to recover a money judgment for unpaid Common Charges and shall be maintainable without foreclosing or waiving the lien securing such charges (a foreclosure of the aforesaid lien provided under the Condominium Act or a suit to recover a money judgment is hereinafter referred to as the "Legal Proceedings"). In the event proceeds received in any Legal Proceedings are less than the obligations of such Residential Unit Owner as more fully described in subparagraph (vi) below, such Residential Unit Owner will be liable for any shortfall.

(v)    Landlord shall be entitled to draw on the Security Fund, as described in the Subsection entitled "Security Fund" in Part I of the Plan. In the event that funds are drawn from the Security Fund, such funds shall be redeposited from proceeds received from any Legal Proceedings or otherwise as more fully described below.

(vi)    Any funds received by any Board, by any Recognized Unit Mortgagee or by Landlord in respect of a Residential Unit Owner Default shall be applied according to the following priority:

(1)    first, to pay such Defaulting Residential Unit Owner's Residential Proportionate Rent obligations to Landlord, together with interest thereon commencing on the date on which such Residential Proportionate Rent was due, to the extent such sums were not previously withdrawn from the Security Fund (the sum of the obligations described in this clause (1) is herein referred to as the "Residential Unit Obligations");

(2)    second, to reimburse the Security Fund for any amounts withdrawn therefrom by Landlord in accordance with the terms of the Lease in respect of such Residential Unit Owner Default or any condominium costs attributable to the Units;

(3)    third, to satisfy any tax liens and other liens, if any, with respect to the Unit or the Defaulting Residential Unit Owner as to which such Residential Unit Default has occurred, which have priority over the lien of the Condominium Board for Common Charges or the lien of any Recognized Unit Mortgagee;

(4)     fourth, to pay such Defaulting Residential Unit Owner's monetary obligations to any Recognized Unit Mortgagee, if any, under a Unit Mortgage the lien of which has priority ahead of any other mortgage lien;

(5)     fifth, to pay to Landlord the balance of any Rent including any Landlord's Condominium Costs (which are the reasonable costs and expenses incurred by Landlord, including but not limited to, reasonable attorneys' fees and disbursements, incurred by Landlord in the curing of such default and interest at the default rate of interest) with respect to the Unit not otherwise reimbursed, together with the interest on the unpaid amount at the Involuntary Rate;

(6)     sixth, to pay to the Condominium Board the balance of any Common Charges due and unpaid by such Defaulting Residential Unit Owner, including all Condominium Default Costs;

(7)     seventh, to pay such Defaulting Unit Owner's monetary obligations to any Unit Mortgagee under a Unit Mortgage the lien of which does not have first priority ahead of all other mortgage liens; and

(8)     eighth, any excess to such Defaulting Residential Unit Owner or as may otherwise be required by Law.

c.     **General**

Each Board must cooperate with Landlord in any actions or proceedings brought or rights or remedies exercised by Landlord, including, without limitation, the Legal Proceedings, against any Defaulting Unit Owner (and such other Persons as Landlord may deem necessary or desirable) and, upon Landlord's request, and at no cost or expense to Landlord, shall promptly furnish to Landlord such information and documentation as may reasonably be requested by Landlord. In the event that the Condominium Board fails to take any action required or permitted to be taken under the Lease, the Condominium Board shall be deemed to have assigned to Landlord the right to bring any Legal Proceeding in its own name or in the name of the Condominium Board.

Within twenty (20) days after Landlord's request, the Condominium Board shall deliver a schedule of the names of Unit Owners and Unit designations. Landlord, at its own expense, may examine the books and records of the Condominium Board. The Condominium Board may appoint a managing agent for the management of the Property and for collection of all Common Charges from Unit Owners. No member of the Condominium Board shall have any personal liability under the Lease.

### Sale and Mortgaging of Units

In order to sell, assign or otherwise transfer, lease, mortgage or otherwise encumber a Unit (each such transaction is referred to herein as a "Sale") the following conditions must be satisfied:

(i) Landlord shall have received any Transaction Payment, Additional Transaction Payment and/or Flip Tax Payment, as the case may be, and all Proportionate Rent pertaining to such Unit that is due and payable as of the date of such Sale; (ii) such Sale (other than mortgaging or leasing of such Unit) is effectuated pursuant to the Unit Deed, the form of which is set forth in Part II of the Plan, and a copy thereof is delivered to Landlord; (iii) in the case of the mortgaging of such Unit, a correct and complete copy of the mortgage encumbering such Unit (the "Unit Mortgage") granted by the Unit Owner, as mortgagor, and the Unit Mortgage Subordination and Recognition Agreement (see Exhibit F to the Declaration in Part II of the Plan), which is binding on and benefits the Unit Mortgagee holding such Unit Mortgage, has been delivered to Landlord and the mortgagee holding such mortgage (the "Recognized Unit Mortgagee") has executed and delivered to Landlord the Recognition Agreement; (iv) in the case of the leasing of such Unit, such leasing is effectuated pursuant to a written lease that conforms to all applicable provisions of this Lease including, without limitation, the provisions applicable to subleases and the Condominium Documents, a correct and complete copy of which has been delivered to Landlord; and (v) Landlord has been paid a reasonable fee to compensate it for its actually incurred Administrative Fee in connection with such Sale, as Landlord may determine from time to time not to exceed $250.00 beginning with the First Closing; $260.00 during the second twelve (12) months of such period, $270 during the third twelve (12) months of such period, $280 during the fourth twelve (12) months of such periods and $290 during the fifth twelve (12) months of such period.

The Declaration provides and the Recognition Agreement to be entered into by each Recognized Unit Mortgagee holding a first mortgage upon a Unit, acknowledges, that the lien of the Unit Mortgage is subordinate to the lien of the Condominium for unpaid Common Charges to the extent such Common Charges consist of Proportionate Rent due from a Defaulting Unit Owner. Where the Unit Mortgage is not a first mortgage lien, such Unit Mortgage shall be subordinate to the lien of the full amount of the Common Charges.

The Unit Mortgagees also have the right to designate a Mortgage Representative; and after notice to Landlord of such designation, the Mortgage Representative shall have the right to participate on behalf of such mortgagees, in any arbitration, condemnation and insurance adjustment proceedings pursuant to the Lease.

### Condemnation

If all or substantially all of the Property is taken by condemnation or eminent domain, the Lease shall terminate and Rent shall be apportioned as of the date of such taking. Any award in the event of such taking shall be apportioned in the following order of priority: (i) Landlord receives the value of the Land and the Civic Facilities and such site improvements made by Landlord and all unpaid Rent; (ii) Recognized Unit Mortgagees shall receive the unpaid principal indebtedness with interest; (iii) Landlord will receive the value of its reversionary interest in the Building (it being agreed that for thirty (30) years from the Scheduled Completion Date the value of Landlord's reversionary interest shall be zero); and (iv) Tenant will receive any balance, subject to rights of any mortgagees.

If "less than substantially all" (as such term is defined in the Lease) of the Property is taken, such fact shall not relieve Tenant from its obligations under the Lease, including, but not limited to, the payment of Rent without abatement of any kind. The Condominium Board, as Tenant under the Lease, is obligated to at its own expense, to restore the remaining part of the Building whether or not the net condemnation award is sufficient to cover the cost of such restoration so that the remaining part of the Building so restored shall be a complete, operable, self-contained architectural unit in good condition and repair in conformity with the Master Development Plan and the Design Guidelines and, to the extent reasonably practicable, in the event such Restoration is commenced within ten (10) years from the date the Building is substantially completed, the Construction Documents. As provided in the By-Laws, in the event the net condemnation award is insufficient to cover the cost of such restoration, the Condominium Board will allocate such deficit or surplus, as the case may be, pro rata, as follows: (a) borne and shared by all Unit Owners in accordance with their respective Common Interests; (b) borne and shared by all Residential Unit Owners with respect to any taking of the Residential Common Elements pro rata in accordance with their Common Interests; and (c) borne and shared by all Residential Unit Owners having exclusive access to the Residential Limited Common Elements pro rata in accordance with their respective interest in such Residential Limited Common Interests; (d) borne and shared by all Commercial Unit Owners with respect to any taking of the Commercial Common Elements pro rata in accordance with their Common Interests, and (e) borne and shared by all Commercial Unit Owners having exclusive access to the Commercial Common Elements with respect to any taking of the Commercial Limited Common Elements pro rata in accordance with respective interest in such Commercial Limited Common Interests. The entire award for the Land considered as unimproved and unencumbered by the Lease, and the fair market value of the Civic Facilities shall be paid to Landlord and the balance, if any, shall be paid to the Depository, who shall make same available to Tenant, less expenses incurred by the Depository, the Mortgage Representative and Landlord in the condemnation proceedings. If restoration costs exceed both $1,000,000 and the amount of the net condemnation award, then Tenant shall deposit a bond, cash or other security with the Depository to assure completion free of liens. Under the Lease, a Depository is an Institutional Lender (such as a savings bank or a commercial bank or trust company) designated by Tenant which has signed an agreement to hold funds under the Lease in a segregated, non-commingled interest-bearing account in New York City.

If temporary use of any or all of the Property is taken for a public or quasipublic purpose, Tenant shall give Landlord prompt notice and shall continue to pay full Rent, and Tenant shall receive any award, provided: (a) same will be paid to the Depository and applied to Rent payments or cost of restoration, if any, during the term of the Lease, if the taking does not extend beyond term; or (b) same will be apportioned between Landlord and Tenant as of the expiration date of the Lease if the taking extends beyond the term of the Lease.

Landlord, Tenant and any Mortgagee or Unit Mortgagee representative, if applicable, shall be entitled to file a claim and otherwise participate in any condemnation or similar proceeding and all hearings, trials and appeals in respect thereto.